Charles ZOSLAW and Jane Zoslaw, husband and wife, dba Marin Music Centre, Plaintiffs,

v.

COLUMBIA BROADCASTING SYSTEM, INC., a corporation, et al., Defendants.

No. C–75–0007 RFP.

United States District Court, N. D. California.

Jan. 17, 1980.

As Amended April 4, 1980.

Maxwell P. Keith, Keith & Duryea, San Francisco, Cal., for plaintiffs.

John Hauser, John Bates, Patricia Shuler, McCutchen, Doyle, Brown & Enerson, San Francisco, Cal., for defendant Columbia Broadcasting System.

Renee P. Tatro, M. Laurence Popofsky, Heller, Ehrman, White & McAuliffe, San Fracisco, Cal., for defendant Warner/Elektra/Atlantic.

Robert Fremlin, Alf R. Brandin, Lillick, McHose & Charles, San Francisco, Cal., for defendant ABC Records.

Richard J. Lucas, A. W. Fargo, III, Orrick, Herrington, Rowley & Sutcliffe, San

Francisco, Cal., for defendant Eric Mainland Dist. Co.

John M. Anderson, Landels, Ripley & Diamond, San Francisco, Cal., for defendant Integrity Inc.

Melvin R. Goldman, Stanley A. Doten, Morrison & Foerster, San Francisco, Cal., for defendants MTS Inc. & Tower Enterprises.

William Billick, J. Halleck Hoeland, Rosenfeld, Meyer & Susman, Beverly Hills, Cal., for defendant MCA Distributing Corp.

C. F. Gray, Jr., Gray & Thurn, Sacramento, Cal., for defendant Doug Robertson Advertising.

John Curran Ladd, Steinhart, Goldberg, Feigenbaum & Ladar, San Francisco, Cal., for defendant Polygram Distribution, Inc.

## OPINION

PECKHAM, Chief Judge.

## I. INTRODUCTION

### A. *Summary*

Plaintiffs, the owners of a retail music store, brought this antitrust action in January 1975 against a number of phonograph record and tape manufacturers' distributors and certain of their retail customers alleging violations of the Robinson-Patman and Sherman Acts.

In June 1976 and thereafter, this court granted summary judgments in favor of several of the defendant's distributors on the Robinson-Patman claims on the basis that there was no subject matter jurisdiction because the allegedly discriminatory sales were not in interstate commerce.[1] In addition, settlements disposed of claims against other defendants.[2]

At this point six defendants remain in this lawsuit. Presently, five of the six remaining defendants move for summary judgment.[3]

Having heard argument on these motions, and after considering the supporting papers and reviewing the voluminous record, it is the decision of this court to grant defendants' motions for summary judgment against plaintiffs for two independent reasons.

First, plaintiffs have failed in their reply to defendants' motions to produce competent evidence from which it could be inferred that the alleged violations occurred, as required by Rule 56(e) of the Federal Rules of Civil Procedure and our own Local Rule 220–8.

Second, plaintiffs' factual contentions, even if accepted as we must for the purpose of ruling on the merits of plaintiffs' legal claims, do not support any viable theory of liability against the defendants now before the court.

### B. *Parties*

#### *Plaintiff Retailers*

Plaintiffs Charles Zoslaw and Jane Zoslaw did business under the name Marin

---

1. Summary judgments on the Robinson-Patman claims were granted to the following defendants: (1) Warner/Elektra/Atlantic Corporation, Order dated June 21, 1976; (2) Eric Mainland Distributing Company, Order dated July 20, 1976; and (3) CBS, Inc., Order dated April 18, 1977.

   Polygram Distribution, Inc.'s motion for summary judgment was granted except for the period 1971–73 when United Distributing Company distributed records, Order dated August 17, 1977.

   Capitol Records, Inc.'s motion for summary judgment was granted on identical Robinson-Patman claims made against the distributor defendants in the related case of *Gramaphone v. CBS, Inc.*, CCH 1977–1 Trade Cases ¶ 61,260 (N.D.Cal., Dec. 15, 1976), after Capitol settled with the plaintiffs in this case.

2. Retailers Integrity Entertainment Corporation doing business as "Wherehouse" and CBS, Inc. doing business as "Discount Records" were dismissed as defendants pursuant to settlements.

   Distributors CBS, Inc., RCA Corporation, Eric Mainland Distribution Company, Transamerica Corporation, and Capitol Records, Inc. were dismissed as defendants pursuant to settlements. Capitol Records, Inc. entered into a voluntary settlement agreement in June, 1975. When the settlement failed, Capitol was granted summary judgment; Order dated September 26, 1978.

3. Defendant ABC, Inc. has not filed a Rule 56 motion as to any claims asserted by plaintiffs.

Music Centre and operated a Mill Valley retail music store which sold phonograph records and equipment, prerecorded tapes, and other related merchandise. The store opened in August 1965 and engaged in business until closing in May 1977.

### Defendant Distributors

Three of the five defendants presently before the court are record distributors: Warner/Elektra/Atlantic Corporation ("WEA"); MCA Distributing Corporation ("MCA"); and Polygram Distribution, Inc. ("Polygram").

WEA is a New York corporation engaged in wholesale distribution of phonograph records and tapes produced by Warner Communication Corporation.

MCA is a New York corporation which is a wholly-owned subsidiary of MCA Records, a manufacturer of phonograph records and tapes. MCA is engaged in wholesale distribution of its parent corporation's goods.

Polygram is a California corporation engaged in the wholesale distribution of records and tapes. Polygram was formerly known by the names Phonodisc, Inc. and UDC, Inc.

WEA, MCA, and Polygram through its subsidiaries sold phonograph records and tapes to plaintiffs and other retail stores in the San Francisco Bay Area during the time period relevant to this litigation.

### Defendant Retailer

The fourth defendant moving for summary judgment is a record retailer and is comprised of MTS, Inc. and Tower Enterprises, Inc. ("MTS-Tower"). MTS, Inc. is a California corporation which owns stock in and operates a number of retail record and tape stores including 14 stores in California. MTS, Inc. is the sole shareholder of Tower Enterprises, Inc., a California corporation doing business as Tower Records, a retail record store in San Francisco. Neither MTS, Inc. nor Tower Enterprises, Inc. have ever owned or operated any retail store in Marin County where plaintiffs' store was located. MTS, Inc. and Tower Enterprises, Inc. doing business as Tower Records have been sued and have defended jointly. For purposes of analysis they may be treated as a single entity: MTS-Tower.

### Defendant Advertiser

The fifth and final moving party defendant is Doug Robertson Advertising, Inc. ("Doug Robertson Advertising"), a California corporation engaged in the advertising business. Doug Robertson Advertising owns five percent of the stock of five of the retail record stores operated by MTS-Tower, and Doug Robertson Advertising was the advertising agency for MTS-Tower during the time period pertaining to this suit.

### C. Background

Four years of discovery reveal that the facts underlying this action are straightforward albeit voluminous. For the most part the facts are uncontroverted and need only be summarized here.

In 1965 plaintiffs Charles and Jane Zoslaw opened a retail store, known as Marin Music Centre, which sold records, stereos, television sets, sheet music and musical instruments from a single location in a shopping center in Mill Valley. At the time the Zoslaws opened their store there were few other record stores in Marin County. Neither plaintiff had prior experience in retailing phonograph records and prerecorded tapes, nor in any other retail business except for Mr. Zoslaw's involvement with a family grocery business in his earlier years.

Plaintiffs suffered startup losses in 1965 and 1966 and claim to have operated at a profit for the following two years. After this the store entered financial difficulties from which it never recovered. The record shows that Marin Music Centre suffered losses by at least 1971 and that this trend continued until the store went out of business in May 1977.

Between the onset of Marin Music Centre's continuing money troubles and the time it ceased doing business the Marin County market changed dramatically. During this period several other stereo and record retailers, and musical instrument outlets opened in Marin County. Simultaneously the number of record departments

in department stores, drug stores, and grocery stores also increased. These record departments compete for sales with retail stores like Marin Music Centre.

The market became extremely competitive. This court has previously indicated that the Marin County retail record business was characterized by "price wars." *Zoslaw v. Columbia Broadcasting Systems, Inc.,* CCH 1977–1 Trade Cases ¶ 61,334 (N.D.Cal.); *Zoslaw v. CBS, Inc.,* CCH 1978–2 Trade Cases ¶ 62,269 (N.D.Cal.). As plaintiff testified, Marin Music Centre's prices were higher than those of its competitors.[4]

In January 1975, a little over two years before closing the store, the Zoslaws brought this action. As initially framed by the complaint, this was essentially an action for illegal price discrimination against a number of phonograph record and tape manufacturers, their distributors and certain of their retail customers. Plaintiffs alleged that the distributor defendants sold their products to retail chain stores at lower prices than those offered to single stores such as plaintiffs' Marin Music Centre in violation of section 2(a) of the Robinson-Patman Act, 15 U.S.C. § 13(a). Plaintiffs also alleged that the defendants discriminated in favor of retail chain stores by granting promotional allowances and by furnishing special services in violation of sections 2(d) and 2(e) of the Act, 15 U.S.C. §§ 13(d) and 13(e).

Plaintiffs alleged that certain of these retail stores knowingly induced and received these purported price discriminations and favorable treatment contrary to sections 2(d), 2(e) and 2(f) of the Robinson-Patman Act, 15 U.S.C. §§ 13(d), 13(e) and 13(f).

Rounding out the complaint, plaintiffs charged a conspiracy in restraint of trade in violation of section 1 of the Sherman Act, 15 U.S.C. § 1.

In early 1976 plaintiffs filed an amended complaint adding new defendants and increasing the amount of damages sought.

Thereafter this court entered summary judgment in favor of several of the distributor defendants on the Robinson-Patman Act claims. Plaintiffs amended their complaint by substantially realleging the Robinson-Patman claims as a series of conspiracies by the defendants to discriminate. This second amended complaint was filed in October 1976.

In March 1977 this court denied plaintiffs' preliminary injunction motion directed against the alleged discriminations.

Finally, in November 1977 plaintiffs amended the complaint a third time by alleging that the defendants had forced them out of business. Five of the remaining six defendants now move for summary judgment.

## II. THE LACK OF FACTUAL SUPPORT FOR PLAINTIFFS' CLAIMS

█ Plaintiffs filed a massive set of opposition papers which regularly and systematically violate the rules governing responses to motions for summary judgment. Since plaintiffs' papers do not comply with the requirements of the Federal Rules of Civil Procedure or the Local Rules of the Northern District of California, we find that plaintiffs fail to present competent evidence to support either their Robinson-Patman or Sherman Act claims against the summary judgment motions of the five defendants before the court. This serious deficiency under Rule 56(e) of the Federal Rules of Civil Procedure and also Local Rule 220–8 is, by itself, a sufficient ground for entering summary judgment in favor of defendants. *First National Bank v. Cities Service,* 391 U.S. 253, 288–90, 88 S.Ct. 1575, 1592–1593, 20 L.Ed.2d 569 (1967); *Thornhill Publishing Co. v. General Telephone & Electronics,* 594 F.2d 730, 738 (9th Cir. 1979); *Mutual Fund Investors, Inc. v. Putnam Management Co.,* 553 F.2d 620, 624 (9th Cir. 1977).

---

**4.** Deposition of J. Zoslaw (1979) 145:13–16; and Answers to WEA's Interrogatories, 5:1–5, 22:26–28.

Rule 56 of the Federal Rules of Civil Procedure and Local Rule 220–8 provide an orderly procedure by which parties present the court with the factual information necessary to decide motions for summary judgment. In particular, Rule 56(e) provides in part:

> Form of Affidavits; Further Testimony; Defense Required. Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissable in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith ... When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

The Northern District's Local Rule 220–8 concerning "Affidavits and Declarations" provides in part:

> Factual contentions made ... in opposition to any motion shall be supported by affidavits or declarations ... Extracts from depositions, interrogatory answers, requests for admission and other evidentiary matter will be considered only if presented appropriately authenticated by affidavit or declaration.

The defendants' replies to plaintiffs' opposition to summary judgment, and for that matter, the entire record are rife with examples of plaintiffs failure to comply with the aforementioned rules.[5]

This court has only recently admonished the same plaintiffs, directing their attention to their duty to provide proper authentication for the facts upon which they rely in opposing a summary judgment motion. In granting defendant Capitol Records' motion for summary judgment, we underscored the gravity of plaintiffs' disregard of the rules:

> Plaintiffs' opposition to the summary judgment motion is hardly a model of correct form. No evidentiary affidavits or declarations are attached, most of the assertions are undocumented, and those that are documented are simply references to answers to interrogatories or depositions, many of them self-serving hearsay, which are contained in the case file. They do not conform to the requirements of Fed.R.Civ.P. 56(e) or Local Rule 220–8. Plaintiffs' attorney did, however, attach his own affidavit to the effect that "there is no way such an extensive documentation of evidence can be handled through the filing of exhibits attached to declarations in support of opposition memoranda." We sympathize with this general problem, but in this case it cannot excuse the manifest inadequacies of plaintiffs' position.

*Zoslaw v. CBS*, CCH 1978–2 Trade Cases ¶ 62,269 at p. 75674.

Notwithstanding our admonition, plaintiffs' opposition papers to the latest series of summary judgment motions are blatantly inadequate under the governing rules. Here it will serve to illustrate by way of example what is, we are afraid, merely the tip of the iceberg.

■ Under optimal circumstances the tremendous volume of plaintiffs' opposition papers would have been burdensome. However, plaintiffs' careless presentation and poor organization impedes any conscientious effort to review their evidence. Plaintiffs have contended that attaching evidentiary documents to their memoranda in compliance with Federal Rule 56(e) and Local Rule 220–8 is impractical, given the thousands of pages involved. We agree,

---

5. *Examples cited in* MTS-Tower's Reply Memorandum, pp. 3–7, filed July 5, 1979, Docket No. 746; MCA's Reply Brief, pp. 3, 14–18, filed July 5, 1979, Docket No. 747; Polygram's Closing Brief, pp. 4–8, filed July 6, 1979, Docket No. 751. *See also* WEA's Reply Memorandum, pp. 3, 8, filed July 5, 1979, Docket No. 749.

548

but this does not absolve plaintiffs from the obligation to make the supporting documentation readily accessible to the court or to opposing parties for the purpose of substantiating plaintiffs' factual contentions and inferences. A party should not prevail simply by clogging the court and smothering the opposition with a heap of ersatz evidence. If anything, in cases where evidence is voluminous, as compared to simpler controversies, the offering party is under a greater obligation to organize, summarize, index and identify the underlying documentation. In this case we found it necessary to sift through hundreds of pages of documents in order to find evidence referred to in plaintiffs' memorandum. Sometimes we were unable to ever locate the referenced document,[6] and many documents, characteristically misfiled, were found only after lengthy searches.[7]

In addition, plaintiffs' papers fall far short of the standard for authentication set by the Ninth Circuit. *United States v. Dibble*, 429 F.2d 598, 602 (9th Cir. 1970); *see also Mabey v. Reagan*, 376 F.Supp. 216, 223 (N.D.Cal.1974), *rev'd on other grounds*, 537 F.2d 1036 (9th Cir. 1976). Plaintiffs' memorandum regularly refers to documents which are unauthenticated or unexplained.[8] With great frequency plaintiffs attempt to authenticate cited documents is improper.[9]

Further, aside from plaintiffs' failure to identify and authenticate documents they have not proffered evidence which supports their factual allegations. Plaintiffs have asserted many factual allegations for which they provide no citations whatsoever.[10] And even where documents are cited, and can be located, we find that often the suggested inferences are implausible.[11]

Considering this record in light of the applicable legal standards we conclude that summary judgment is appropriate.

■ Mindful that summary judgments are disfavored in antitrust cases where motive or intent is critical, such relief, properly used, is a valuable means to avoid squandering judicial time and resources. *Mutual Fund Investors, Inc. v. Putnam Management Co.*, 553 F.2d 620, 622 (9th Cir. 1977). As the Ninth Circuit has stated, "To hold otherwise would give free rein to any plaintiff who can draft an antitrust complaint capable of withstanding a motion to dismiss to go to trial with only a wing and a prayer supporting his well drafted complaint." *Id.* at 624.

The Supreme Court has specifically held that a party moving for summary judgment in an antitrust case should prevail, once the movant has met his burden, in the absence of "any significant probative evidence tending to support the complaint." *First Na-*

6. *E.g.*, Document 71186 *cited by* Plaintiffs' Opposition Memorandum, p. 24:8–17, filed May 29, 1979, Docket No. 736.

7. *E.g.*, Document 9395, *cited by* Plaintiffs' Opposition Memorandum, *supra* (hereafter Plaintiffs' Memorandum), p. 21:8–17; Document 37333 *cited by* Plaintiffs' Memorandum p. 40:23; Documents 7803, 7804, 7805 *cited by* Plaintiffs' Memorandum p. 25:22.

8. E.g., references to exhibits in Plaintiffs' Memorandum at p. 31:20–9, p. 46:1 and 30, p. 50:28–9, p. 51:18–9, p. 59:21–22.

9. *See e.g.*, references to depositions in Plaintiffs' Memorandum at pp. 16, 36, 58, 59, 74, 79 and 80; and to Exhibits A and B in C. Zoslaw's Declaration in Opposition at p. 4.

The lack of proper authentication is aggravated by the fact that most of the documentary evidence entered as exhibits lacks signatures, letterheads, and other distinctive markings. For example, none of the exhibits which com-

prise the preponderance of plaintiffs' evidence on prices and advertising bear the name or the signature of the executor: *i.e.*, Exhibits 6, 7, 9–4, 9–5, 9–12, 10, 14, 17, 20, 21 and 22.

10. E.g., Plaintiffs' Memorandum p. 7:28–32 regarding the major distributors' purported control of "virtually all sales of phonograph records and tapes in the United States," and the centralization of retailing in California in the hands of a few favored retailers.

Plaintiffs' Memorandum at p. 15 regarding alleged concentration of the retail market.

Plaintiffs' Memorandum at p. 80 regarding the dangerous probability of success of MTS-Towers' alleged attempt to monopolize.

11. *E.g.*, Exhibit 5, Plaintiffs' Memorandum at p. 30:31 to 31:2; Exhibit 9–1 to 9–11, Plaintiffs' Memorandum at p. 31; and Exhibit 16, Document No. 55029, Plaintiffs' Memorandum at pp. 45–6.

*tional Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968); *Harvey v. Fearless Farris Wholesale, Inc.,* 589 F.2d 451, 454 (9th Cir. 1979).

In order to prevail the defendants are required first to demonstrate pursuant to Rule 56 of the Federal Rules of Civil Procedure "the absence of a genuine issue as to any material fact." In this case movants clearly met their burden of proof.

Defendants having sufficiently supported their motion, the plaintiffs must, if the case is to go to trial, controvert the defendants' showing. *Cities Service, supra,* 391 U.S. at 289, 88 S.Ct. at 1592; Fed.R.Civ.P. 56(e). In considering plaintiffs' opposition we have construed all evidence and inferences in the light most favorable to plaintiffs as we must. *United States v. Diebold,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962).

We find that plaintiffs failed to controvert the defendants' showing. Plaintiffs have not produced any competent evidence from which it could be inferred that the alleged violations occurred.

We will not permit plaintiffs to go to trial on the basis of the allegations in their complaint, coupled with the hope that something can be developed at trial in the way of support for the allegations. In the words of Mr. Justice Marshall, "while we recognize the importance of preserving litigants' rights to a trial on their claims, we are not prepared to extend these rights to the point of requiring that anyone who files an antitrust complaint setting forth a valid cause of action be entitled to a full dress trial notwithstanding the absence of any significant probative evidence tending to support the complaint." *Cities Service, supra* 391 U.S. at 289–90, 88 S.Ct. at 1592–1593.

## III. THE LACK OF LEGAL SUPPORT FOR PLAINTIFFS' CLAIMS

Even if we found that plaintiffs had properly supported their factual contentions we would conclude, as a matter of law, that defendants are entitled to summary judgment. Plaintiffs' version of the facts simply do not support a viable theory of recovery.

### A. Robinson-Patman Claims

#### 1. Defendant Distributors

Since WEA has previously been granted summary judgment on the Robinson-Patman Act claims only two of the defendant distributors, MCA and Polygram, have outstanding claims against them.

We find here, as we have in ruling on earlier summary judgment motions that we lack subject matter jurisdiction over the Robinson-Patman Act claims asserted against MCA and Polygram.

■ To establish Robinson-Patman jurisdiction, one of two sales which, when compared generate a discrimination, must cross a state line. *Gulf Oil Corp. v. Copp Paving Co.,* 419 U.S. 186, 95 S.Ct. 392, 42 L.Ed.2d 378 (1974); *Zoslaw v. CBS,* Civ. No. 75–0007 GBH (Memorandum, June 21, 1976, p. 6). Further, where interstate sales are *de minimis* there is no price discrimination within the ambit of the Robinson-Patman Act. *See Hanson v. Pittsburg Plate Glass Industries, Inc.,* 482 F.2d 220, 224 (5th Cir. 1973), *cert. denied,* 414 U.S. 1136, 94 S.Ct. 80, 38 L.Ed.2d 761 (1974); *Skinner v. United States Steel Corp.,* 233 F.2d 762, 764 (5th Cir. 1956); F. Rowe, *Price Discrimination Under the Robinson-Patman Act,* § 4.9 at 78 (1962).

#### a. The lack of jurisdiction over MCA.

Plaintiffs do not satisfy either of the tests for Robinson-Patman jurisdiction over MCA.

During the period from 1971 to 1978, MCA distributed its records and tapes to its customers in the United States through a series of regional warehouses. Only MCA's Los Angeles warehouse was responsible for serving retailers selling MCA merchandise in the San Francisco Bay Area. Infrequently, MCA made direct shipments from its Illinois manufacturing plant to a retail outlet in the Bay Area. Such shipments are known as "drop shipments."

■ Goods sent from out of state to a storage point for general inventory purposes "leave" interstate commerce. *Zoslaw v. CBS, supra* (Opinion and Order on Eric-Mainland Distributing Company's Motion for Summary Judgment filed July 20, 1976); *Country Maid, Inc. v. Haseotes,* 324 F.Supp. 875, 877 (E.D.Pa.1971); 4 J. von Kalinowski, Antitrust Laws and Trade Regulation, § 26.02[3] at pp. 26-42—26-43 (1976 ed.); *accord, Hampton v. Graff Vending Co.,* 516 F.2d 100, 103 (5th Cir. 1975); *Cliff Food Stores, Inc. v. Kroger, Inc.,* 417 F.2d 203, 210 (5th Cir. 1969). There is no dispute over the fact that the records sent to Los Angeles were shipped for general inventory purposes and not for immediate resale as would be the case with perishable goods like milk. *See Great Atlantic & Pacific Tea Co. v. FTC,* 557 F.2d 971 (2d Cir. 1977), *rev'd on other grounds,* 440 U.S. 69, 99 S.Ct. 925, 59 L.Ed.2d 153 (1979); 1 P. Areeda & D. Turner, Antitrust Law § 233(b) (1978).

■ Consequently, MCA's goods shipped from the Los Angeles warehouse to the San Francisco Bay Area are wholly intrastate and not "in commerce."

■ Neither do MCA's drop shipments give rise to jurisdiction. Using plaintiffs' figures for the years from 1972 to 1977, inclusive, the cumulative percentage of MCA's sales to retailers in the Bay Area which was attributable to drop shipments was .475% of the total volume of orders or $90,369.71.[12] In 1971 drop sales were less than 1%.[13] Consistent with our earlier rulings in this case we find that the volume of these drop shipments was *de minimis.*[14]

■ Plaintiffs have argued, relying on Sherman Act cases, that returned merchandise shipped from a retailer in the Bay Area back to MCA's Illinois plant should be considered interstate traffic for the purpose of determining Robinson-Patman Act jurisdiction. We disagree. The relevant measure of jurisdiction in Robinson-Patman cases is the "in commerce" test rather than the less rigorous "affecting commerce" test applicable to Sherman Act claims. *See Zoslaw v. CBS, supra* (Memorandum of Decision, June 21, 1976, pp. 7-8) applying *Gulf Oil Corp. v. Copp Paving Co.,* 419 U.S. 186, 200-1, 95 S.Ct. 392, 401, 42 L.Ed.2d 378 (1974). Returns of unwanted merchandise are not sales in interstate commerce within the Robinson-Patman Act.

For these reasons we grant MCA's motion on the Robinson-Patman Act claims.

b. *The lack of jurisdiction over Polygram.* We have already granted summary judgment in favor of Polygram on the Robinson-Patman claims for the years 1974-76 when Phonodisc, Inc. was Polygram's distributor. Here we grant summary judgment for the years 1971-73 which is the period when UDC, Inc. was a distributor.

Polygram (UDC), like MCA, serviced its Bay Area customers through its in-state warehouse in Sun Valley, California. These sales, as shown above, are intrastate and not within the Robinson-Patman Act.

■ Moreover, a considerable portion of the merchandise involved was manufactured in California as well as being shipped from a California warehouse to a California retailer.

Drop sales provide no alternate basis of jurisdiction over Polygram (UDC). We conclude that plaintiffs unsubstantiated figure of $213,000.00 of drop sales is *de minimis.*[15]

12. These figures rely in part upon the questionable accuracy of Mr. Zoslaw's conclusion that in 1973 the dollar volume of drop sales was $57,236.80. (Zoslaw Declaration at ¶ 4). Combining Mr. Zoslaw's figure for 1973 with the data previously submitted, the drop shipment total amounts to $90,369.71 or .475% of total sales. Contending persuasively that Zoslaw has double counted, MCA calculates the drop shipments at $74,151.49 or .44% of total sales for 1972-79. See MCA's Reply Brief, pp. 4-6, *supra* n. 5.

13. Declaration of Otto Perry, ¶ 4 (uncontroverted).

14. *See* n.1 *supra.*

15. Plaintiffs' Memorandum merely states, without documentation: "The admission by [Polygram (UDC)] that it arranged for $213,000 in drop shipments raises interstate commerce jurisdiction as a matter of law." Plaintiffs' Memorandum at p. 15.

### 2. Defendant Retailer

■ Plaintiffs allege that retailer MTS-Tower induced or received price discriminations in violation of section 2(f) of the Robinson-Patman Act. The Supreme Court has recently held that a buyer cannot be held liable for a violation of section 2(f) unless the seller is liable for price discrimination under section 2(a) of the Act. *Great American & Pacific Tea Co. v. FTC*, 440 U.S. 69, 75 78, 99 S.Ct. 925, 930–931, 59 L.Ed.2d 153 (1979). Having previously found that plaintiffs cannot satisfy the jurisdictional requirements as to their section 2(a) claims against the distributor-sellers, it conclusively follows under the rule of *A & P* that there cannot be a section 2(f) violation by MTS-Tower, the retailer-buyer.

■ Plaintiffs also allege that MTS-Tower induced or received promotional allowances and services in violation of sections 2(d) and 2(e) of the Robinson-Patman Act. However, under the Act, there is no private right of action available to plaintiffs against an allegedly favored buyer with regard to allegedly illegal promotional allowances and services. *General Beverage Sales Co. v. East Side Winery*, 396 F.Supp. 590, 596 (E.D.Wis.1975). In particular, sections 2(d) and 2(e) simply fail by their own terms to provide any sanction against a buyer who knowingly accepts discriminatory prices, services, or facilities.[16]

Accordingly, plaintiffs do not have a Robinson-Patman claim against MTS-Tower.

### 3. Defendant Advertiser

■ We frankly are unable to discern the factual or legal basis upon which plaintiffs hope to hold Doug Robertson Advertising liable. With respect to Robinson-Patman claims, it suffices that we find that there is no allegation or evidence that Doug Robertson participated in illegal conduct in interstate commerce, and thus jurisdiction is lacking. *Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 95 S.Ct. 392, 42 L.Ed.2d 378 (1974). Having decided this threshold issue in defendant's favor, we will not dwell on the other deficiencies of plaintiffs' claim.

### B. Sherman Act Claims

### 1. Defendant Distributors

■ As a matter of law plaintiffs cannot prevail on their Sherman Act claims against the three defendant distributors, WEA, MCA and Polygram. Plaintiffs' own testimony highlights the fact that during the time of the alleged conspiracy to re-

---

*Las Vegas Merchant Plumbers Assn. v. United States*, 210 F.2d 732 (9th Cir. 1954), the sole authority which plaintiffs rely on, is a Sherman Act case which explicitly applies the "affecting commerce" standard as opposed to the "in commerce" standard applicable here. Furthermore, in that case the drop sales were a "not insubstantial" addition to other significant amounts of interstate sales.

In contrast to plaintiffs' bald assertion that drop sales were $213,000, we note Polygram's careful calculation and documentation placing non-drop shipments in the range of 97.4 to 99% of Polygram (UDC)'s total sales. Polygram's Memorandum, pp. 11–15, filed March 15, 1979, Docket No. 681.

**16.** Sections 2(d) and 2(e) of the Robinson-Patman Act, 15 U.S.C. §§ 13(d) and 13(e) provide:

Payment for services or facilities for processing or sale

(d) It shall be unlawful for any person engaged in commerce to pay or contract for the payment of anything of value or for the benefit of a customer of such person in the course of such commerce as compensation or in consideration for any services or facilities furnished by or through such customer in connection with the processing, handling, sale, or offering for sale of any products or commodities manufactured, sold, or offered for sale by such person, unless such payment or consideration is available on proportionally equal terms to all other customers competing in the distribution of such products or commodities.

Furnishing services or facilities for processing, handling, etc.

(e) It shall be unlawful for any person to discriminate in favor of one purchaser against another purchaser or purchasers of as commodity bought for resale, with or without processing, by contracting to furnish or furnishing, or by contributing to the furnishing of, any services or facilities connected with the processing, handling, sale, or offering for sale of such commodity so purchased upon terms not accorded to all purchasers on proportionally equal terms.

strain trade, retail prices fell and the number of competing retailers rose.[17]

Plaintiffs theorize that the alleged price discriminations which they cannot bring under the Robinson-Patman Act are conspiracies cognizable under the Sherman Act. Essentially, they postulate two conspiracies: first, an overall conspiracy which has horizontal and vertical aspects; and second, a completely vertical conspiracy.

We find it difficult, if not impossible, to conceptualize plaintiffs' overall conspiracy theory. Plaintiffs theorize that the defendant distributors illegally conspired with retailers. However, plaintiffs do not allege a horizontal conspiracy involving only distributors. Instead, they present a notion which strains the imagination of an overall conspiracy arising from the consciously parallel acts of distributors and retailers.

In order to prevail on their overall conspiracy theory, plaintiffs must establish the existence of a conspiracy or agreement among the defendants. Plaintiffs offer no direct evidence of conspiracy, and all the defendants strenuously deny the allegations. Conceding the lack of independent evidence of the alleged conspiracies,[18] plaintiffs invoke the doctrine of conscious parallelism.

■■■■ For plaintiffs to establish a Sherman Act conspiracy through circumstantial evidence and the doctrine of conscious parallelism, plaintiffs must first show parallel conduct. *Independent Iron Works, Inc. v. United States Steel Corp.*, 322 F.2d 656 (9th Cir. 1963). General similarity of conduct is not enough, even "substantially similar" manner of conducting business cannot alone support an inference of conspiracy. *Theatre Enterprises, Inc. v. Paramount Film Distribution Corp.*, 346 U.S. 537, 540–41, 74 S.Ct. 257, 259, 98 L.Ed. 273 (1954); *Independent Iron Works, supra* at 661–62; *accord, Hanson v. Shell Oil Co.*, 541 F.2d 1352, 1359 (9th Cir. 1976), *cert. denied,*

429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977). Once again plaintiffs' presentation of their case has made our determination difficult in that they have not identified precisely what behavior they believe constitutes parallel action. However, we find that the record demonstrates a lack of of uniform behavior in the areas that plaintiffs apparently construe as examples of parallelism, i.e., prices and accounts classifications, advertising, and extension of credit. We further fail to discern any parallelism in other possibly significant areas, i.e., sales promotion programs, payment terms, shipment terms, and merchandise return privileges.

■■■■ Even had the record revealed parallel conduct, which we find it does not, this alone will not support an inference of concerted action. *First National Bank v. Cities Service Co.*, 391 U.S. 253, 279–80, 287, 88 S.Ct. 1575, 1587–1588, 1591, 20 L.Ed.2d 569 (1968); *Syufy Enterprises v. National General Theatres*, 575 F.2d 233, 236 (9th Cir. 1978), *cert. denied*, 439 U.S. 954, 99 S.Ct. 352, 58 L.Ed.2d 345. In addition to evidence of parallel business behavior, two additional elements must be present before a conspiracy may be inferred: (1) a showing of acts by defendants in contradiction of their own economic interests, and (2) satisfactory demonstration of a motivation to enter into an agreement. *Venzie Corp. v. United States Mineral Productions, Inc.*, 521 F.2d 1309, 1314 (3d Cir. 1975); *Aviation Specialties Inc. v. United Technologies Corp.*, 568 F.2d 1186, 1192 (5th Cir. 1978); *Admiral Theatre Corp. v. Douglas Theatre Co.*, 585 F.2d 877, 884 (8th Cir. 1978); D. Turner, *The Definition of Agreement Under the Sherman Act: Conscious Parallelism and Refusals to Deal*, 75 Harv.L.Rev. 655, 681 (1962).

Nevertheless, we cannot find in the record, nor do plaintiffs contend, that there is evidence that defendants acted in a manner

---

17. *E.g.*, Affidavit of Charles Zoslaw, dated October 9, 1976, p. 1:26 to 2:20; Complaint, ¶ 18; and Plaintiffs' Memorandum at pp. 45–6. *See also* WEA's Memorandum at p. 23, filed March 16, 1979, Docket No. 688.

18. Plaintiffs' Memorandum at p. 71.

adverse to their economic interests. Nor have plaintiffs attempted to advance any colorable rationale for the alleged combination among competitors.[19]

In contrast to plaintiffs' allegations of conspiracy in restraint of trade, the only plausible inference from the record is that defendants acted in response to competition and in a manner intended to meet competition.

We therefore conclude as a matter of law that plaintiffs theory of an overall conspiracy is without merit.

Plaintiffs are left with their allegation of vertical conspiracies, which we find to be frivolous and accordingly reject out of hand.

In the absence of a horizontal conspiracy to charge different prices or a vertical agreement to exclude competitors, price discrimination does not support a claim under section 1 of the Sherman Act. *Rutledge v. Electric Hose & Rubber Co.*, 327 F.Supp. 1267, 1272 (C.D.Cal.1971), *aff'd*, 511 F.2d 668 (9th Cir. 1975). We find no evidence of such agreements. Rather, we see in the record examples of competitive pricing. Nor can we find that a combination exists in violation of section 1 merely because the distributor-sellers have negotiated a favorable price with retailer-buyers. A mere contract which does not restrict either party's dealings with others may be preferential, but it is not a restraint of trade. *National Tire Wholesale, Inc. v. Washington Post Co.*, 441 F.Supp. 81, 87 (D.D.C. 1977). In reality, plaintiffs would have us construe the Sherman Act in a way that would interfere with the essence of trade and competition.

The root of this problem with the vertical conspiracy theory is that plaintiffs seek to prosecute an alleged price discrimination under the Sherman Act. This is simply contrary to the intent of Congress,[20] and is in "open conflict" with national antitrust policy. *Automatic Canteen Co. v. FTC*, 346 U.S. 61, 63, 73, 73 S.Ct. 1017, 1019, 1024, 97 L.Ed. 1454 (1953).

Being abundantly clear that there is no legal foundation for plaintiffs' Sherman Act claims, we grant summary judgment on these claims in favor of WEA, MCA and Polygram.

### 2. Defendant Retailer

For each of the reasons discussed above, plaintiffs' Sherman Act conspiracy charges

---

19. Indeed, plaintiffs have advanced no rationale as to why competing distributors would combine in order to lower prices for retail accounts. Such a combination is counter-intuitive. The more likely object of a combination among distributors would be to withstand demands by large accounts for lower prices.

Compounding the failure to explain the motivation for the purported combination to lower retail prices, plaintiffs inconsistently assert the existence of a distributors' scheme to maintain retail prices. *Compare* Plaintiffs' Memorandum pp. 36–7, which allege low selling practices *with* pp. 48–50, which allege price maintenance.

Plaintiffs' only reference to the required showing of motivation is a single sentence which reads "The reward of group conspiracy, the raising of list and cost prices, the ease of early market penetration with albums, but with extensive returns allowed to the favored chains, the control of entry into distribution provided the motivation."

This conclusory allegation, hardly amounts to a showing of motivation and is without support in the record.

20. Section 2 of the Clayton Act, 38 Stat. 730 (1914)—later amended by the Robinson-Patman Act—which made price and promotional discriminations unlawful under certain circumstances was enacted because the Sherman Act did not proscribe such discriminations.

The Senate Report on the Clayton Act states "The Bill, in its treatment of unlawful restraints and monopolies, seeks to prohibit and make unlawful certain trade practices, which, as a rule, singly and in themselves, are not covered by the [Sherman Act]." S.Rep.No.698, 63d Cong., 2d Sess. at 2.

In the House debate on the Clayton Act, Representative John C. Floyd, one of the three framers of the Act, stated that price discrimination "has never been held to be a violation of the Sherman Law, and, in my opinion, such act of discrimination is not within the purview of the Sherman Law as it now exists . . ." House Debate, 63d Cong., 2d Sess., May 25, 1914, at 9200, reprinted in 2 E. Kinter, *The Legislative History of the Federal Antitrust Laws and Related Statutes*, p. 1325 (1978). See also 15 Cong.Rec. 9199–9200 (1914).

against MTS-Tower must fail as a matter of law.

Now we need only analyze plaintiffs' charges that MTS-Tower has monopolized and attempted to monopolize in violation of section 2 of the Sherman Act.

At the outset we note that plaintiffs' monopoly theory is so crude, so haphazard at this late stage of the litigation that careful analysis risks lending it more credence than it deserves.

We also note, before exploring the convolutions of plaintiffs' legal theory, that plaintiffs' shortcomings under Rule 56(e) are particularly aggregious in its monopoly case against MTS-Tower. We are not so much troubled here by impermissible presentation of a surplusage of incompetent evidence as we are surprised and concerned by the absence of any attempt to offer evidence to support sweeping conclusory statements. We are not impressed by plaintiffs' imaginative and almost wholly undocumented recharacterization of the allegations of the complaint. Something more is required. *First National Bank v. Cities Service*, 391 U.S. 253, 288–90, 88 S.Ct. 1575, 1592–1593, 20 L.Ed.2d 569 (1967). No support whatsoever for the monopolization allegation appears in plaintiffs' opposition to MTS-Tower's motion for summary judgment.

For the sole purpose of applying the legal standards of monopoly power, we choose from plaintiffs' array of suggested markets the one most favorable to their case—the so-called "San Francisco-Marin Market." This market, we add, is the only arguably relevant market because it is the only conceivable geographic area of competition between plaintiffs and MTS-Tower. 1 J. von Kalinowski, Antitrust Laws and Trade Regulation, § 8.02[b] at pp. 8–25 to 8–30; *see also Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 484–89, 97 S.Ct. 690, 695–697, 50 L.Ed.2d 701 (1977).

■ The undisputed facts show that MTS-Tower does not have monopoly power in the San Francisco-Marin market. MTS-Tower operates only two stores in the six Bay Area Counties, one each in San Francisco and Berkeley. There are literally hundreds of other sources for the retail purchase of records and tapes in the Bay Area. MTS-Tower's share is relatively small. Uncontroverted testimony put MTS-Tower's percentage of total retail sales in this region at less than ten percent. Obviously, MTS-Tower's market share is neither predominant nor monopolistic. *Twin City Sportservice, Inc. v. Charles Finley & Co.*, 512 F.2d 1264, 1274 (9th Cir. 1975); *United States v. Aluminum Co. of America*, 148 F.2d 416, 424 (2d Cir. 1945) (per Hand, J.).

The charge that MTS-Tower is liable for attempted monopolization is also fatally flawed.

Plaintiffs' proposed "short cut" for establishing an attempt to monopolize is the path to reversible error. We reject their interpretation of precedent.

■ There are three essential elements of an attempt to monopolize offense: The plaintiffs must show (1) specific intent to control price or exclude competition with respect to a part of commerce, (2) predatory or anticompetitive conduct directed to accomplishing the unlawful purpose, and (3) a dangerous probability of success. *Gough v. Rossmoor Corp.*, 585 F.2d 381, 390 (9th Cir. 1978), *cert. denied*, 440 U.S. 936, 99 S.Ct. 1280, 59 L.Ed.2d 494; *Janich Brothers, Inc. v. American Distilling Co.*, 570 F.2d 848, 853 (9th Cir. 1977). A fourth element of the offense is "causal antitrust injury," which is necessary to confer standing and to support a claim for damages. *California Computer Products, Inc. v. IBM Corp.*, 1979–1 Trade Cases ¶ 62,713, pp. 2184–5 (9th Cir.).

The first indispensible element of an attempt to monopolize claim is proof of "specific intent to destroy competition or build a monopoly." *Knutson v. Daily Review, Inc.*, 548 F.2d 795, 814 (9th Cir. 1976), *cert. denied*, 433 U.S. 910, 97 S.Ct. 2977, 53 L.Ed.2d 1094 (1977).

■ Plaintiffs have not offered nor even suggested that there is any direct evidence of specific intent. Plaintiffs may rely on circumstantial evidence, but in the absence of direct evidence of specific intent

plaintiffs must show that MTS-Tower's allegedly predatory conduct constituted a substantial claim of an unreasonable restraint of trade. *California Computer Products, Inc. v. IBM Corp., supra* at 2183; *Knutson, supra* at 814; *Hallmark Industry v. Reynolds Metals Co.*, 489 F.2d 8, 12 (9th Cir. 1973), *cert. denied*, 417 U.S. 932, 94 S.Ct. 2643, 41 L.Ed.2d 235 (1974), *reh. denied*, 419 U.S. 1028, 95 S.Ct. 509, 42 L.Ed.2d 304 (1974). That is, specific intent to monopolize may be inferred from a violation of section 1 of the Sherman Act. *California Computer Products, supra.*

Plaintiffs erroneously rely on *Gough, supra*, for the proposition that specific intent to monopolize can be proven by evidence of predatory acts alone. It appears that plaintiffs offer examples of sharp practice in order to prove predation, and argue that from this showing the other two elements, specific intent and dangerous probability of success, may be inferred.[21]

Indeed, if the law permitted such bootstrapping virtually every instance of vigorous competition would give rise to liability for attempted monopolization. Actually, *Gough* hoists plaintiffs by their own petard for it clearly states that in the absence of direct evidence there must be "proof of predatory or anticompetitive conduct which *constitutes an unreasonable restraint of trade.*" 585 F.2d at 390 (emphasis supplied). Predation alone is insufficient. Since there is no direct evidence and since we have already concluded that plaintiffs do not present a substantial claim of an unreasonable restraint, much less a violation of section 1 of the Sherman Act, plaintiffs are unable to establish specific intent.

We also conclude that there is no independent basis for determining the existence of the element of a dangerous probability of success. Proof of dangerous probability of success "may be satisfied either by direct proof of market power ... or by inference from the proven specific intent itself ...." *California Computer Products,*

*Inc. v. IBM Corp., supra* at 2184. But we have shown that plaintiffs cannot establish either MTS-Tower's monopoly market power or specific intent to attempt to monopolize.

Plaintiffs' total effort to address the probability of success element of their attempt claim is found in three sentences of the 86-page Opposition Memorandum, sentences which are typically conclusory and unsupported:

3. *Dangerous Probability*

The restraints ... resulted in breath-taking interstate growth of market power. It was attained by foreclosure of competitors including plaintiffs. These are two effects supportive of a finding of dangerous probability, separate and apart from the short-cut method laid down in *Gough*.

Plaintiffs' Memorandum, p. 80. We disagree. Plaintiffs cannot pull MTS-Tower to trial on this slender thread.

It follows from all of the foregoing that summary judgment must be granted in favor of MTS-Tower as to all of plaintiffs' Sherman Act claims.

4. *Defendant Advertiser*

Plaintiffs' sole theory of Sherman Act liability against Doug Robertson Advertising is that Doug Robertson Advertising knowingly allowed MTS-Tower to effect restraints of trade. Plaintiffs' Memorandum, p. 80.

Given that we find that plaintiffs cannot show that any other defendants have conspired or illegally restrained trade, Doug Robertson Advertising cannot be liable for being a conspirator, or a complaint instrumentality of the purported restraints. Moreover, we find on the record, no other conceivable basis for liability.

Therefore we grant summary judgment in favor of defendant Doug Robertson Advertising.

## IV. CONCLUSION

This is a case in which the operators of an unsuccessful business invoke the antitrust

21. E.g., Plaintiffs' Memorandum pp. 34, 58–60, 78–9.

laws in order to recoup losses inflicted by stiff competition. However, the antitrust laws protect competition and not competitors. For all of the reasons set forth in this opinion, we grant summary judgment in favor of defendants WEA, MCA, Polygram, MTS-Tower, and Doug Robertson Advertising and against plaintiffs Charles and Jane Zoslaw.

IT IS SO ORDERED.