693 F.2d 870
 1982-83 Trade Cases 65,078
 Charles ZOSLAW and Jane Zoslaw husband and wife, dba Marin
Music Centre, Plaintiff-Appellants,
v.
MCA DISTRIBUTING CORPORATION, Doug Robertson Advertising,
Inc., MTS, Inc., Tower Enterprises, Inc.,
Warner/Elektra/Atlantic Corporation, ABC Records, Inc.,
Polygram Distribution, Inc., Capitol Records, Inc. and
Capitol Industries-EMI, Defendants-Appellees.
 Nos. 80-4330, 80-4429.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Nov. 9, 1981.
Decided Dec. 1, 1982.
 
 Maxwell Keith, Keith & Duryea, San Francisco, Cal., for Zoslaw.
 M. Laurence Popofsky, Melvin R. Goldman, San Francisco, Cal., argued for WEA; Heller, Ehrman, White & McAnuliffe, San Francisco, Cal., on brief.
 Melvin R. Goldman, Morrison & Foerster, San Francisco, Cal., for MTS and Tower.
 Charles F. Gray, Jr., Gray & Thurn, Sacramento, Cal., for Doug Robertson Advertising.
 Alf R. Bandin, Lillickm McHose & Charles, San Francisco, Cal., for ABC Records.
 George A. Cumming, Jr., Brobeck, Phleger & Harrison, San Francisco, Cal., for Capitol Records and Capitol Ind. Emi, Inc.
 John Curran Ladd, Steinhart, Ladd & Jubelirer, San Francisco, Cal., for Polygram.
 William Billick, Rosenfeld, Meyer & Susman, Beverly Hills, Cal., for MCA.
 Appeal from the United States District Court for the Northern District of California.
 Before BAZELON,* SKOPIL and POOLE, Circuit Judges.
 POOLE, Circuit Judge:
 
 
 1
 This is an appeal by Charles and Jane Zoslaw, the former owners of a retail record store, from a series of orders entered by the district court granting summary judgment in favor of appellee record distributors: Warner/Elektra/Atlantic Corporation (WEA); MCA Distributing Corporation (MCA), Polygram Distribution, Inc. (Polygram)[1], ABC Records, Inc. (ABC) and Capitol Records, Inc. and its parent corporation, Capitol Industries-EMI (jointly, Capitol), appellee retailer, MTS, Inc. (MTS)[2] and appellee Doug Robertson Advertising, Inc. (Doug Robertson). In this appeal the Zoslaws claim that the district court erred in finding that they had failed to satisfy the "in commerce" jurisdictional requirement of the Robinson-Patman Price Discrimination Act, and in concluding that they had failed to raise an issue of material fact concerning their claims under sections 1 and 2 of the Sherman Antitrust Act. We reverse the district court's ruling as to the Robinson-Patman claims except as to Doug Robertson and affirm as to the Sherman Act claims.
 
 I. STATEMENT OF CASE
 
 2
 Appellants operated Marin Music Centre, a Mill Valley retail store which sold phonograph records and equipment, prerecorded tapes and related merchandise. They experienced startup losses in 1965 and 1966 and then claimed to have operated at a profit for the following two years. After that period, the store encountered financial difficulties from which it never recovered, suffering losses from at least 1971 until it went out of business in 1977.
 
 
 3
 The district court found that during the time the Zoslaws were in business the Marin County record market "changed dramatically." 533 F.Supp. 540, 546 (N.D.Cal.1980). Several other retail record and tape stores opened in the area and the number of department stores, grocery stores and drug stores with record departments also increased. Charles Zoslaw readily admitted that the store suffered losses because other stores sold records at lower prices.
 
 
 4
 In January, 1975, appellants filed this action. They subsequently filed three amended complaints adding various defendants and factual contentions. As thus amended the complaint named all of the appellee record distributors: WEA, MCA, Polygram, Capitol and ABC. Several other named distributors, who subsequently settled with appellants, were CBS, Inc., RCA, Inc., Eric-Mainland Distributing Company, United Artists Music and Record Group, Inc. (UAMARGI) and Transamerica Company, the parent corporation of Eric-Mainland and UAMARGI. Appellants alleged that the distributor defendants violated section 2(a) of the Robinson-Patman Act, 15 U.S.C. Sec. 13(a), by selling records and tapes to retail chain stores at lower prices than those offered to single stores, such as Marin Music Centre, and that the distributors violated sections 2(d) and 2(e) of the Act, 15 U.S.C. Secs. 13(d) and 13(e), by discriminating in favor of retail chain stores in granting promotional allowances and furnishing special services. They also alleged that the distributor defendants conspired among themselves and with the retailer defendants to favor the retail chain stores at the expense of individual stores in violation of section 1 of the Sherman Act, 15 U.S.C. Sec. 1.
 
 
 5
 Three retailers were named defendants: MTS, Integrity Entertainment Corporation (IEC), and CBS, Inc., doing business as Discount Records. The latter two subsequently settled. Also named defendant was Doug Robertson Advertising Agency, with which Tower did business. Appellants alleged that the retailers violated sections 2(d), 2(e), and 2(f) of the Robinson-Patman Act, 15 U.S.C. Secs. 13(d), 13(e), and 13(f), by knowingly inducing and receiving the alleged discriminations in price and other terms, allowances and services. The retailer defendants were also charged with violating section 1 of the Sherman Act by conspiring with the distributors to receive favorable treatment. Finally, appellants accused MTS with monopolizing or attempting to monopolize the retail record market in violation of section 2 of the Sherman Act.
 
 
 6
 In the two years after appellants instituted the action, four distributor defendants moved for partial summary judgment on the ground that the court lacked jurisdiction under Robinson-Patman because the allegedly discriminatory sales were not "in commerce" as required by that Act. The district court granted each of these motions: in favor of WEA on June 21, 1976, see Zoslaw v. Columbia Broadcasting System, 1977-1 Trade Reg.Rep. (CCH) p 61,756; in favor of Eric-Mainland on July 20, 1976; in favor of CBS on April 18, 1977; and in favor of Polygram (limited to the period 1974 and 1976) on August 17, 1977.[3]
 
 
 7
 In October, 1977, appellants filed a motion for preliminary injunction to prevent the defendant distributors from favoring chain store retailers and to prevent the defendant retailers from accepting such preferences. The motion also sought to prohibit Capitol Records from refusing to sell phonograph records, tapes and cassettes to Marin Music Centre. This claim arose when Capitol, shortly after settling with the appellants, ceased selling merchandise to them. Appellants then amended their complaint to reinstate Capitol as a defendant based on its refusal to deal. The district court denied the motion, finding that appellants had failed to demonstrate a likelihood of success on the merits or a showing of irreparable injury.
 
 
 8
 In September, 1978, the district court granted Capitol's motion for summary judgment on the refusal to deal claim, finding that Capitol had legitimate business reasons for its action.[4] Three of the four remaining distributor defendants, WEA, MCA, and Polygram, as well as MTS and Doug Robertson, then moved for summary judgment on all of the remaining claims against them. In January, 1980, the court granted all of the defendants' pending motions. In its opinion, the district court, held, first, that appellants failed to produce competent evidence to support their factual allegations. The court noted that the appellants' opposition papers "regularly and systematically" violated Rule 56 of the Federal Rules of Civil Procedure as well as Rule 220-8 of the Local Rules of the Northern District of California. The court observed that most of the documents submitted by appellants with their opposition lacked authentication and that they often failed to support the factual inference for which they had been provided.
 
 
 9
 The court then ruled that even if appellants had properly supported their factual allegations, summary judgment was still appropriate since they had failed to advance an adequate legal theory of the case. The remaining Robinson-Patman claims were dismissed against two of the distributor defendants, MCA and Polygram, on the finding that appellants had failed to satisfy the "in commerce" requirement of the Act. The court also held that it lacked jurisdiction over appellants' Robinson-Patman claims against MTS and Doug Robertson because the Supreme Court's decision in Great Atlantic & Pacific Tea Co. v. FTC, 440 U.S. 69, 99 S.Ct. 925, 59 L.Ed.2d 153 (1979), precluded jurisdiction under section 2(f) and that there was no private right of action against buyers under sections 2(d) and 2(e).
 
 
 10
 As for the Sherman Act section 1 claims, the court found no basis in the material submitted by appellants to support any of the claims of conspiracies to restrain trade alleged by appellants, and found no reasonable factual inference in support of appellants' monopolization and attempted monopolization claims against MTS.
 
 
 11
 In May, 1980, the last remaining defendant, ABC, filed its motion for summary judgment on both the Robinson-Patman and Sherman Act claims. The district court granted this motion and entered judgment in favor of all of the defendants in June, 1980.[5]
 
 
 12
 Appellants challenge the district court's findings that the allegedly discriminatory sales were not "in commerce" as required by Gulf Oil Corp. v. Copp Paving Co., 419 U.S. 186, 200, 95 S.Ct. 392, 401, 42 L.Ed.2d 378 (1974), and therefore not within section 2(a) of the Robinson-Patman Act. Alternatively, they contend that even if section 2(a) is inapplicable, the court still had jurisdiction over the distributor defendants under sections 2(d) and 2(e), and over MTS and Doug Robertson under section 2(f). As for the Sherman Act, appellants claim that the district court erred in finding no genuine issue of material fact concerning the existence of a conspiracy among distributors and retailers to favor certain chain retailers. They also contend that the district court erred in finding no evidentiary support for their claim that MTS attempted to monopolize trade. Finally, appellants contend that the district court ignored disputed factual issues when it concluded on motion for summary judgment that Capitol's refusal to deal was a unilateral act made for legitimate business reasons.
 
 II. ROBINSON-PATMAN JURISDICTION
 A. The Distributor Appellees
 
 13
 Although the district court issued several opinions in granting summary judgment on the Robinson-Patman claims involving the distributor appellees, the relevant facts regarding the sales by each appellee can be briefly summarized.
 
 
 14
 Two of the distributor appellees, WEA and Polygram are wholly owned subsidiaries of corporations engaged in record and tape production.[6] During the relevant period the other two appellees, ABC and MCA, manufactured and distributed records and tapes nationwide.[7] Each distributor maintained a regional warehouse in California which supplied records and tapes for stores in the San Francisco Bay Area, including MTS and Marin Music Centre. Depending on the distributor involved, each of the warehouses received a varying percentage of records and tapes which were manufactured out of state. For example, WEA's California warehouse received approximately 10% of its records and tapes from out of state, while Polygram's warehouse received approximately 15% of its goods from out of state.[8]
 
 
 15
 In certain instances, each distributor made "drop shipments" to Bay Area retail record stores. A drop shipment occurred when the distributor's California warehouse was unable to fill an order from a retail store. In that case the distributor would order the out of state manufacturing plant to send a shipment of records or tapes directly to the local retailer. Drop shipments occurred infrequently. For example, MCA calculated its cumulative percentage of dollar sales to the San Francisco Bay Area attributable to drop shipments at 0.44%.
 
 
 16
 To prove jurisdiction under section 2(a) of the Robinson-Patman Act, a plaintiff must demonstrate: (1) that the defendant is "engaged in interstate commerce;" (2) that the price discrimination occurred "in the course of such commerce;" and (3) that "either or any of the purchases involved in such discrimination are in commerce." William Inglis & Sons Baking Co. v. ITT Continental Baking Co., 668 F.2d 1014, 1043 (9th Cir.1981).[9]
 
 
 17
 In Gulf Oil Corp. v. Copp Paving Co., 419 U.S. 186, 95 S.Ct. 392, 42 L.Ed.2d 378 (1974), the Supreme Court concluded that the jurisdictional "in commerce" language in section 2(a) is not as broad as the "affecting commerce" language in the Sherman Antitrust Act. In particular, the court interpreted the "purchases ... in commerce" requirement as limiting the section's application to cases "where 'at least one of the two transactions which, when compared generate a discrimination ... cross[es] a state line.' " 419 U.S. at 200, 95 S.Ct. at 401 (quoting Hiram Walker, Inc. v. A & S Tropical, Inc., 407 F.2d 4, 9 (5th Cir.), cert. denied, 396 U.S. 901, 90 S.Ct. 212, 24 L.Ed.2d 177 (1969)). See Inglis, 668 F.2d at 1043.
 
 
 18
 The district court, in applying Gulf Oil, concluded that the sales by the distributor appellees were not "in commerce" and that the drop sales were de minimis and therefore would not support jurisdiction under section 2(a). Appellants challenge both of these rulings.
 
 
 19
 1. Were the Record and Tape Sales to Bay Area Stores "In Commerce?"
 
 
 20
 In examining the interstate sales, the district court recognized that if goods from out of state are still within the "practical, economic continuity" of the interstate transaction at the time of the intrastate sale, the latter sale is considered "in commerce" for purposes of the Robinson-Patman Act. See Hampton v. Graff Vending Co., 516 F.2d 100, 102 (5th Cir.1975) (quoting Gulf Oil Corp. v. Copp Paving Co., 419 U.S. at 195, 95 S.Ct. at 398). In determining whether the sales of records here were therefore in the flow of commerce the court relied on the traditional intent test derived from the Fair Labor Standards Act, and subsequently applied in Robinson-Patman cases.[10] See Walling v. Jacksonville Paper Co., 317 U.S. 564, 570, 63 S.Ct. 332, 336, 87 L.Ed. 460 (1942); Walker Oil Co. v. Hudson Oil Co., 414 F.2d 588, 590 (5th Cir.), cert. denied, 396 U.S. 1042, 90 S.Ct. 684, 24 L.Ed.2d 686 (1969); Food Basket, Inc. v. Albertson's Inc., 383 F.2d 785 (10th Cir.1967); 4 J. Von Kalinowski,Antitrust Laws and Trade Regulation Sec. 26.02 (1969 & Supp.1981).
 
 
 21
 Under this approach, the flow of commerce ends when goods reach their "intended" destination. Von Kalinowski, supra. In gauging the point of destination courts consider whether goods coming from out of state respond to a particular customer's order or anticipated needs. Walling, 317 U.S. at 567-70, 63 S.Ct. at 335-336. If so, the sales meet the "in commerce" requirement even though the goods may be stored in a warehouse before actual sale to the buyer.[11] Walling, 317 U.S. at 570, 63 S.Ct. at 336; Hampton, 516 F.2d at 102-03. However, goods leave the stream of commerce when they are stored in a warehouse or storage facility for general inventory purposes, that is, with no particular customer's needs in mind. Hampton, 516 F.2d at 103; Cliff Food Stores, Inc. v. Kroger, Inc., 417 F.2d 203, (5th Cir.1969).
 
 
 22
 In Walker Oil, 414 F.2d at 588, for example, the plaintiff service station owner charged the defendant, Hudson Oil, with selling gasoline at a different price at its Florida station than at its Alabama station. Hudson purchased gasoline for the two stations from a supplier in Mobile, Alabama. The Fifth Circuit concluded that since Hudson's purchases from the Alabama supplier for its Florida station were not based on specific needs of retail customers of the service station, the flow of commerce ended when the gasoline was delivered to the station.
 
 
 23
 The district court here determined from affidavits submitted by appellees that the latter stocked their California warehouses for general inventory purposes depending on a record's anticipated performance, and did not order records for particular customers. That conclusion is supported by the record, and appellants do not offer serious dispute. Based on this finding, the court held that the subsequent sales to Bay Area retailers were not in the flow of commerce.
 
 
 24
 This emphasis on intended destination as a key to the statute's coverage has been criticized by some commentators as providing a means by which interstate producers may avoid Robinson-Patman liability by setting up local storage facilities in the secondary states. See 1 P. Areeda & D. Turner, Antitrust Law p 233(b) (1978); ABA Antitrust Section, The Robinson-Patman Act: Policy and Law 44-45 (1980). On the contrary, the cases relied on by the district court and cited by appellees primarily involve sales by out of state producers to distributors or retailers who then resell the goods intrastate at the allegedly discriminatory price. See, e.g., Walling, 317 U.S. at 564, 63 S.Ct. at 332; Food Basket, 383 F.2d at 785; Hampton, 516 F.2d at 100. In such cases the analysis of intent is useful in determining whether the initial sale from the out of state producer bears sufficient relationship to the subsequent allegedly discriminatory sale to conclude that the latter sale, is part of a continuous interstate transaction and hence in commerce. See P. Areeda & D. Turner, supra. Conversely, where a producer simply moves goods manufactured out of state into the state and resells at the allegedly discriminatory price, there is no intermediate sale to break the flow of commerce. And indeed, it would seem that Standard Oil Co. v. FTC, 340 U.S. 231, 71 S.Ct. 240, 95 L.Ed. 239 (1951), in which the Supreme Court held that in state storage of gasoline by an interstate oil producer did not end the flow of commerce, imposes some limit upon the application of the intent rule.
 
 
 25
 In Standard Oil, the defendant, accused of discriminating in selling oil to Michigan jobbers, refined the oil out of state and then shipped it to its own storage facilities in Michigan from which delivery was made to customers upon individual orders. Although the gasoline rested up to several months in the storage facility, the court held that it remained part of the flow of commerce:
 
 
 26
 Any other conclusion would fall short of the recognized purpose of the Robinson-Patman Act to reach the operations of large interstate businesses in competition with small concerns. Such temporary storage of the gasoline as occurs ... does not deprive the gasoline of its interstate character.
 
 
 27
 340 U.S. at 237-38, 71 S.Ct. at 243-244 (citations omitted). Moreover, the Court specifically distinguished the early Fair Labor Standard Act cases, including Walling, noting that in those cases "interstate commerce ceased on delivery to a local distributor," while "the sales involved here are those of an interstate producer and refiner to a local distributor." 340 U.S. at 238 n. 6, 71 S.Ct. at 244 n. 6.
 
 
 28
 We interpret Standard Oil to indicate that interstate producers of goods produced out of state do not meaningfully interrupt the flow of commerce by simply storing them in the state of eventual sale. Viewed in this light we think the district court prematurely granted summary judgment to the appellee distributors. In particular, the declarations and answers to interrogatories submitted by ABC and MCA indicate that both manufactured records and tapes outside of California, which were then placed in California warehouses for eventual sale to retailers. Those actions were not alone sufficient to remove the goods from the stream of commerce.
 
 
 29
 WEA and Polygram did not themselves manufacture records, but they were wholly owned subsidiaries of companies engaged in record and tape production. Sales to subsidiaries in such instances do not necessarily remove such transactions from Robinson-Patman jurisdiction. See Perkins v. Standard Oil Co., 395 U.S. 642, 648, 89 S.Ct. 1871, 1874, 23 L.Ed.2d 599 (1969) ("We find no basis for immunizing Standard's price discrimination simply because the product in question passed through an additional formal exchange before reaching the level of Perkin's actual competitor"). Similarly, "passage of title or the terms of shipment, although relevant, do not control." Hasbrouck v. Texaco, Inc., 663 F.2d 930, 934 (9th Cir.1981); S & M Materials Co. v. Southern Stone Co., 612 F.2d 198, 200 (5th Cir.), cert. denied, 449 U.S. 832, 101 S.Ct. 101, 66 L.Ed.2d 37 (1980).
 
 
 30
 Therefore, as to the record and tape sales by the parent corporations to the WEA and Polygram warehouses in California, we examine the extent to which the subsidiaries acted as independent distributors in their pricing and marketing decisions, in effect, breaking the flow of commerce between the manufacturer and the local retailer. See United States v. American Building Maintenance Industries, 422 U.S. 271, 285, 95 S.Ct. 2150, 2158, 45 L.Ed.2d 177 (1975)[12]; P. Areeda & D. Turner, supra, at p 233(b). Such threshhold issues of jurisdiction are normally questions of fact for the jury to resolve. Hasbrouck, 663 F.2d at 933. Since the district court did not consider these controlling principles and it appears that there are genuine issues of material fact in dispute regarding their resolution the grants of summary judgment in favor of WEA and Polygram were improper.
 
 
 31
 2. De minimis interstate drop sales.
 
 
 32
 After finding the sales to Bay Area retailers from the distributors' California warehouses not "in commerce", the district court considered the impact of the interstate drop sales. It held the sales so "scattered and insignificant" that they insufficiently support a Robinson-Patman Act claim. We have ruled that summary judgment was improperly granted as to the sales from the warehouses but to avoid uncertainty on remand, it should be stated that in our view the district court correctly excluded the drop sales as a basis for jurisdiction.
 
 
 33
 The principle of de minimis is usually appropriate in the light of a finding going to the substance of the action itself that a claimed price discrimination did not "substantially lessen" competition as required by the statute. See, e.g., Hanson v. Pittsburgh Plate Glass Industries, Inc., 482 F.2d 220 (5th Cir.1973), cert. denied, 414 U.S. 1136, 94 S.Ct. 880, 38 L.Ed.2d 761 (1974). However, in several instances courts have made de minimis findings regarding jurisdiction under the Act. Thus in Food Basket, 383 F.2d 785, the court found that certain "drop-sales" of goods from out of state suppliers to a grocery chain were not sufficient to bring the chain under the Act where it received all of its other goods from warehouses located in the state. Accord Skinner v. United States Steel Corp., 233 F.2d 762 (5th Cir.1956); Baldwin Hills Building Material Co. v. Fibreboard Paper Products Corp., 283 F.Supp. 202 (C.D.Cal.1968). But see Von Kalinowski, supra, at Sec. 26.01 (criticizing use of the de minimis test for jurisdictional purposes).
 
 
 34
 Since the district court's decision in this case, we have had occasion to rule on the applicability of the de minimis rule to jurisdictional challenges under the Robinson-Patman Act. In William Inglis, 668 F.2d 1014, the defendant bakery located in California marketed its bread primarily in state. However, it also made sales to accounts in Nevada. We rejected the contention that the Nevada sales were de minimis and therefore insufficient to invoke jurisdiction. While recognizing that interstate sales which were merely "inadvertent or incidental" to a pattern of intrastate sales might justify application of a de minimis rule, 668 F.2d at 1044 n. 54, we concluded that the sales involved were part of a multi-state marketing operation and therefore not de minimis. Id.[13]
 
 
 35
 In contrast the drop sales here were not part of the normal marketing or distribution pattern of the distributors, which, instead focused on supplying Bay Area stores from California warehouses. Drop sales occurred when there were gaps in that distribution system. Given their relative size and sporadic nature the sales appear as an anomaly in the normal distribution pattern. See Food Basket, 383 F.2d at 788. We therefore determine that the circumstances here involve the narrow category in which application of de minimis principles to jurisdictional questions is appropriate.
 
 
 36
 3. Jurisdiction under Sections 2(d) and 2(e) of the Robinson-Patman Act
 
 
 37
 Appellants contend that even if section 2(a) does not apply to the distributor appellees, sections 2(d) and 2(e) apply because the jurisdictional test for those sections is more liberal than the standard under section 2(a).[14] Again, while we reverse the summary judgment that there was no jurisdiction under section 2(a), we conclude that the court correctly held that the jurisdictional reach of sections 2(d) and 2(e) goes no further than section 2(a).
 
 
 38
 Section 2(d) relates to payments for services or facilities and requires that the seller be "engaged in commerce" and that the payment or benefit be "in the course of such commerce." Section 2(e) covers the furnishing of services or facilities for processing and handling and contains no "in commerce" language. However, it has been held that the omission of such language was inadvertent. See Elizabeth Arden, Inc. v. FTC, 156 F.2d 132, 134 (2d Cir.1946), cert. denied, 331 U.S. 806, 67 S.Ct. 1189, 91 L.Ed. 1828 (1947). Neither section contains language as does section 2(a), referring to "purchases ... in commerce." Appellants therefore argue that those sections are not limited by the requirement that there be an interstate sale.
 
 
 39
 Sections 2(d) and 2(e) of the Robinson-Patman Act were enacted to prevent sellers from circumventing section 2(a) by discriminating between buyers in respects other than price. See FTC v. Simplicity Pattern Co., 360 U.S. 55, 68-69, 79 S.Ct. 1005, 1013, 3 L.Ed.2d 1079 (1959). It would therefore be incongruous to hold as appellants suggest, that those sections go beyond the coverage of section 2(a). See W. Patman, Complete Guide to the Robinson-Patman Act 132 (1963); F. Rowe, Price Discrimination Under the Robinson-Patman Act 393 (1962). There are decisions to the contrary, see Shreveport Macaroni Manufacturing Co. v. FTC, 321 F.2d 404, 408 (5th Cir.1963), cert. denied, 375 U.S. 971, 84 S.Ct. 491, 11 L.Ed.2d 418 (1964), but in general cases have concluded that sections 2(d) and 2(e) have the same jurisdictional limitation as section 2(a). See L & L Oil Co. v. Murphy Oil Corp., 674 F.2d 1113, 1116 (5th Cir.1982); Sun Cosmetic Shoppe, Inc. v. Elizabeth Arden Sales Corp., 178 F.2d 150 (2d Cir.1949); R.S.E., Inc. v. Pennsy Supply, Inc., 489 F.Supp. 1227, 1236 (M.D.Penn.1980), Rohrer v. Sears, Roebuck & Co., 1975-1 Trade Reg.Rep. (CCH) p 60,302 (C.D.Mich.1975).
 
 B. The Retailer Appellee--MTS
 
 40
 Section 2(f) of the Robinson-Patman Act makes it unlawful for a buyer "engaged in commerce, in the course of such commerce, knowingly to induce or receive a discrimination in price which is prohibited by this section." (Emphasis added). In Great Atlantic & Pacific Tea Co., 440 U.S. at 69, 99 S.Ct. at 925 (1979), the Supreme Court held that a buyer does not violate section 2(f) in receiving a discrimination in price unless the discrimination is unlawful under section 2(a).
 
 
 41
 The district court, relying on Great Atlantic & Pacific Tea Co., correctly ruled that since the sales by distributors failed to meet the "in commerce" requirement of section 2(a), MTS could not be liable under section 2(f) for receiving the allegedly discriminatory prices. However, since we reverse the court's grant of summary judgment as to the section 2(a) claims, we also reverse the ruling against the section 2(f) claim for further consideration in the light of this opinion.[15]
 
 C. The Appellee Advertiser-Doug Robertson
 
 42
 The district court found no "factual or legal basis upon which plaintiffs hope to hold Doug Robertson Advertising Agency liable." 533 F.Supp. at 551. We agree. Doug Robertson handled MTS advertising. The uncontested declaration submitted by it indicates that the only other connection between the two appellees was that Doug Robertson owned 5% of several MTS subsidiary corporations. It is therefore clear that Doug Robertson did nothing to violate sections 2(a), 2(d) or 2(e) of the Robinson-Patman Act by providing discriminatory prices, promotional or other services to record retailers. Similarly, it received no price discrimination from the record distributors. Accordingly, given the absence of any justiciable claim against it, the district court correctly granted summary judgment to Doug Robertson on the Robinson-Patman claims.
 
 III. THE SHERMAN ACT CLAIMS
 
 43
 The district court granted summary judgment in favor of appellees on all of appellants' claims under the Sherman Antitrust Act. We are admonished by the Supreme Court to proceed with caution in considering summary judgment in antitrust cases. Poller v. Columbia Broadcasting System, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). See Program Engineering v. Triangle Publications, 634 F.2d 1188, 1192 (9th Cir.1980); Ron Tonkin Gran Turismo v. Fiat Distributors, 637 F.2d 1376, 1381 (9th Cir.1981), cert. denied, 454 U.S. 831, 102 S.Ct. 128, 70 L.Ed.2d 109 (1981). However, the Court has also indicated that clever pleading does not entitle an antitrust claimant to a trial with no regard for Rule 56 of the Federal Rules of Civil Procedure. First National Bank of Arizona v. Cities Service, Co., 391 U.S. 253, 289-90, 88 S.Ct. 1575, 1592-1593, 20 L.Ed.2d 569 (1968). See Ron Tonkin, 637 F.2d at 1381; Betaseed, Inc. v. U and I Inc., 681 F.2d 1203, 1207-08 (9th Cir.1982).
 
 
 44
 Under Rule 56, summary judgment is appropriate "where the record before the court on the motion reveals the absence of any material issue of fact and [where] the moving party is entitled to judgment as a matter of law." Portland Retail Druggists Association v. Kaiser Foundation Health Plan, 662 F.2d 641, 645 (9th Cir.1981). The burden of demonstrating the absence of an issue of material fact lies with the moving party. British Airways Board v. Boeing Co., 585 F.2d 946, 951 (9th Cir.1978), cert. denied, 441 U.S. 968, 99 S.Ct. 2420, 60 L.Ed.2d 1074 (1979). The opposing party must then "present specific facts demonstrating that there is a factual dispute about a material issue." Program Engineering, 634 F.2d at 1193; British Airways, 585 F.2d at 951.
 
 
 45
 In this case, the district court found that the appellees carried their burden in demonstrating the absence of a genuine issue of material fact. It ruled, however, that the opposition materials submitted by appellants did not comply with the requirements of Rule 56(e) Fed.R.Civ.P. or Rule 220-8 of the Local Rules of the Northern District of California. The court therefore found that appellants failed to present competent evidence to dispute appellees' showing.[16]
 
 
 46
 Our review of the record amply confirms the district court's finding. In the main, appellants sought to oppose the summary judgment motions by introducing literally hundreds of pages of documents purporting in their cumulative effect to show the existence of a genuine issue of material fact. To meet the requirements of Rule 56 as supplemented by the Local Rules of the district court, such materials are required to be authenticated by affidavits or declarations of persons with personal knowledge through whom they could be introduced at trial. See United States v. Dibble, 429 F.2d 598, 602 (9th Cir.1970) (writings are not admissible under motion for summary judgment without proper foundation); California Pacific Bank v. Small Business Administration, 557 F.2d 218, 222 (9th Cir.1977). As the district court observed, most of the documents lacked any authentication whatsoever. Moreover, appellants made virtually no effort to organize the documents in a reasonably intelligible manner. In many particulars, entire correspondence files or sets of records were included with no attempt to sort out or identify that material which was relevant.
 
 
 47
 A party may not prevail in opposing a motion for summary judgment by simply overwhelming the district court with a miscellany of unorganized documentation. (The district court characterized it as "ersatz evidence.") But even were that organizational prerequisite satisfied, we would be compelled to hold that the materials offered did not, even viewed in the light most favorable to appellants, give rise to a genuine issue of material fact sufficient to prevent a motion for summary judgment. See Cities Services, 391 U.S. at 253, 88 S.Ct. at 1575; British Airways, 585 F.2d at 951-52.
 
 A. The Section 1 Conspiracy Claims
 
 48
 As the district court stated, appellants' Sherman Act allegations come through as an attempt to breathe new life into their Robinson-Patman claims by recasting them in the form of a conspiracy of which appellants suggest two possibilities. The first is an overall conspiracy among the record distributors and chain retailers to favor the latter group at the expense of small record retailers.[17] The second suggestion is of a vertical conspiracy to restrain competition between each distributor and each chain store retailer.
 
 1. The Horizontal Conspiracy
 
 49
 Appellants claim error by the district court in granting summary judgment on the basis that there was no genuine issue of material fact regarding the existence of an overall conspiracy. We have repeatedly articulated the test for granting summary judgment in antitrust conspiracy cases:
 
 
 50
 Once the allegations of conspiracy made in the complaint are rebutted by probative evidence supporting an alternative interpretation of a defendant's conduct, if the plaintiff then fails to come forward with specific factual support of its allegations of conspiracy, summary judgment for the defendants becomes proper.
 
 
 51
 ALW, Inc. v. United Air Lines, Inc., 510 F.2d 52, 55 (9th Cir.1975); Mutual Fund Investors, Inc. v. Putnam Management Co., 553 F.2d 620, 624 (9th Cir.1977). In this case, since the appellees' affidavits all denied any conspiracy with the others, and since appellants presented no direct evidence of conspiracy, appellants' only chance depended on their presentation of circumstantial evidence sufficient to support the inference of a "conscious parallelism" conspiracy theory and on such further inferences as appellants might be able to draw from trade association and credit managers' meetings among the various distributors.
 
 
 52
 a. Conscious Parallelism
 
 
 53
 In proof of the hypothesis of consciously parallel business behavior, appellants point to the distributors' use of similar account classifications, pricing structures and promotional policies. However, as the district court determined, appellants failed to make a proper showing of sufficiently similar conduct in such matters. See Independent Iron Works, Inc. v. United States Steel Corp., 322 F.2d 656, 661 (9th Cir.), cert. denied, 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 165 (1963). Instead, appellees successfully demonstrated considerable variation in the distributors' account classification systems as well as variance in prices offered to retailers by distributors. Moreover, each distributor offered its own package of promotional offers and discounts which, in fact, substantially encouraged competition in the record business.
 
 
 54
 Yet, even if appellants had successfully demonstrated the requisite parallel conduct, the courts also require that the plaintiff demonstrate that the allegedly parallel acts were against each conspirator's self interest, that is, that the decision to act was not based on a good faith business judgment. See Theatre Enterprises, Inc. v. Paramount Film Distributing Corp., 346 U.S. 537, 540-41, 74 S.Ct. 257, 259, 98 L.Ed. 273 (1954); Syufy Enterprises v. National General Theatres, Inc., 575 F.2d 233, 236 (9th Cir.1978); Dahl, Inc. v. Roy Cooper Co., 448 F.2d 17, 19 (9th Cir.1971). The appellees presented sufficient evidence of legitimate business decisions to justify their actions. For example, WEA justified its two-tier account classification system between "subdistributors" and "retailers" as a means of meeting the competition of those distributors who had previously entered the market and who maintained multiple-tier account classifications. In addition, it presented evidence that the lower subdistributor price reflected cost savings to WEA because subdistributors had a centralized location for purchases, billings, returns and deliveries and subdistributors made box-lot purchases of the same records.
 
 
 55
 Certain distributors did give to chain store retailers discounts in addition to those to which they were entitled under their account classification systems. For example, WEA apparently gave MTS a subdistributor price in 1975 even though MTS did not meet WEA's technical definition of a subdistributor. However, appellants' own evidence indicated that the distributors did so because of claims by the large retailers that they were receiving lower prices from the distributors' competitors and that failure to reduce price would adversely affect the retailers' merchandising of the distributor's records. Such evidence does not indicate a conspiracy to favor large record stores. In fact, the Sherman Act is intended to encourage such competition between sellers. See Great Atlantic & Pacific Tea Co., 440 U.S. at 83 n. 16, 99 S.Ct. at 934 n. 16.
 
 
 56
 Finally, appellants' conscious parallelism claim is deficient because it never established a plausible motivation for the conspirators' conduct. In Cities Service the court found the plaintiff's conspiracy theory to be inadequate where the interests of the alleged conspirators were divergent. In the absence of any common motivation, the court concluded, there existed no grounds for inferring a conspiracy. 391 U.S. at 287, 88 S.Ct. at 1591. Accord Venzie Corp. v. United States Mineral Products Co., 521 F.2d 1309, 1314 (3d Cir.1975). Here, appellants are unable to advance any plausible reason why the major record distributors would conspire to favor certain retailers, thus limiting the retail outlets for their own products. Appellants' theory of conspiracy would increase the bargaining power of the major chain stores against the distributors themselves. Indeed, the statements of Joel Friedman, of WEA, which appellants attempted to introduce into evidence, indicates that WEA viewed the buying and marketing practices of chain store retailers as a threat to the distributors. In sum, aside from the most conclusory allegations, appellants have made no attempt to show why it should be held to have been in the interest of the record distributors to engage in conspiracy the result of which would be lowering of prices offered to their largest customers.[18]
 
 
 57
 b. Distributors' meetings and discussions
 
 
 58
 Aside from their conscious parallelism theory, appellants also attempt to prove the existence of a conspiracy on the basis of trade association meetings and exchanges of credit information among distributors. They contend that the participation of distributors at meetings of the National Association of Record Manufacturers (NARM) evidences a "cartel." However, in the absence of any indication of agreement or consent to an illegal arrangement, evidence of industry meetings is not sufficient to prove a conspiracy. Maple Flooring Manufacturers Association v. United States, 268 U.S. 563, 575, 45 S.Ct. 578, 582, 69 L.Ed. 1093 (1925); Hanson v. Shell Oil Co., 541 F.2d 1352, 1359 (9th Cir.1976), cert. denied, 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977). Moreover, appellants presented no evidence that the distributors exchanged price information such as that found objectionable in United States v. Container Corp., 393 U.S. 333, 335, 89 S.Ct. 510, 511, 21 L.Ed.2d 526 (1969) (exchange of information among competitors as to most recent prices charged specific customers).
 
 
 59
 As for the exchange of credit information, appellants introduced evidence that the record distributors' credit managers attended meetings of the National Association of Credit Managers and its regional affiliate, the Credit Managers Association of Southern California, and that at those meetings they exchanged information regarding individual retailers' credit histories.
 
 
 60
 Appellants suggest that the decision of the Supreme Court in Catalano, Inc. v. Target Sales, Inc., 446 U.S. 643, 100 S.Ct. 1925, 64 L.Ed.2d 580 (1980), is that all exchange of credit information is a per se violation of section 1 of the Sherman Act. On the contrary, the court stated that, assuming plaintiff could prove that the defendants agreed to fix credit terms to their customers, such an agreement would be a per se violation of section 1. In fact the court in Catalano explicitly adverted to its earlier holding in Cement Manufacturing Protective Association v. United States, 268 U.S. 588, 45 S.Ct. 586, 69 L.Ed. 1104 (1925), permitting exchange of credit information for the individual use of each member in determining whether to exercise credit. 446 U.S. at 648 n. 12, 100 S.Ct. at 1928 n. 12.
 
 
 61
 The appellants' evidence indicated that the information exchanged by the credit managers regarding certain retailers' credit standing was of the sort the distributors could use for self protection purposes. For example, the distributors exchanged information regarding individual retailers' total indebtedness. However, there was no indication of any agreement to fix credit terms aside from appellants' observation that large retailers in fact received more favorable credit terms than Marin Music Centre--a hardly surprising result in light of their relative volume of sales.
 
 2. Vertical Conspiracy
 
 62
 Appellants allege a number of vertical conspiracies each based on the sales agreement between a distributor and a favored retailer which "caused discrimination in the sale of phonograph records and tapes to the named retail chain stores." In essence, appellants suggest that price discrimination between individual buyers and sellers which would ordinarily form the basis of a secondary-line Robinson-Patman case is also a violation of section 1 of the Sherman Act. Yet the courts have held that such an agreement, without proof of an arrangement to exclude others from the buyer's market does not give rise to a section 1 claim.[19] See e.g., National Tire Wholesale, Inc. v. Washington Post Co., 441 F.Supp. 81 (D.D.C.1977), aff'd, 595 F.2d 888 (D.C.Cir.1979); Rutledge v. Electric Hose & Rubber Co., 327 F.Supp. 1267 (C.D.Cal.1971), aff'd, 511 F.2d 668 (9th Cir.1975).
 
 
 63
 In National Tire, for example, the court rejected the plaintiff's claim that a newspaper's failure to sell its advertising on the same terms as it gave to plaintiff's main competitor violated section 1, stating:
 
 
 64
 [P]laintiff does not allege any basis for a vertical combination in violation of section 1. The contract for advertising space between the Post and Market, albeit a combination, is not a combination within the scope of section 1. The contract sets forth the terms of dealings between the parties; plaintiff does not allege that the terms of the contract in any way restrict either party's dealings with others.
 
 
 65
 441 F.Supp. at 81.
 
 
 66
 Here appellants presented no evidence of any vertical agreement to exclude competitors. Instead, the record indicates that certain retailers negotiated a favorable price with individual distributors. However, even were we to assume some evidence of an exclusionary effect, we have held that such vertical arrangements are not a per se violation of section 1. See Ron Tonkin, 637 F.2d at 1382-87; Gough v. Rossmoor, 585 F.2d 381, 388 (9th Cir.1978); Mutual Fund Investors, 553 F.2d at 626; Joseph Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., 416 F.2d 71, 78-79 (9th Cir.1969). Therefore such agreements do not violate section 1 unless they are found to be unreasonable. Twin City Sportservice, Inc. v. Charles O. Finley & Co., 676 F.2d 1291, 1304 (9th Cir.1982), cert. denied, --- U.S. ----, 103 S.Ct. 364, 73 L.Ed.2d ---- (1982). The reasonableness inquiry is "directed to a balancing of the competitive evils of the restraint against the anticompetitive benefits asserted on its behalf." Gough, 585 F.2d at 388-89.
 
 
 67
 Here there is simply no indication that the sales agreements between individual distributors and retailers constituted an unreasonable restraint of trade. Indeed, the Supreme Court has recognized that the price discrimination which results where buyers seek competitive advantage from sellers encourages the aims of the Sherman Act, a respect in which the Sherman Act is inconsistent with the aims of the Robinson-Patman Act. See Great Atlantic & Pacific Tea Co., 440 U.S. at 82, 83 n. 16, 99 S.Ct. at 934 n. 16; Automatic Canteen Co. v. FTC, 346 U.S. 61, 73-74, 73 S.Ct. 1017, 1024, 97 L.Ed. 1454 (1953). And while appellants point to injury to their particular business, they do not make the necessary showing of a substantially adverse affect on competition in the record market in general. See Ron Tonkin, 637 F.2d at 1388; Mutual Fund Investors, 553 F.2d at 627. In fact, as the district court observed, appellants themselves acknowledge the competitive character of the record and tape sales market. Thus the district court correctly held that appellants had failed to raise a genuine issue of material fact in support of their vertical conspiracy charge.
 
 
 68
 B. The Section 2 Attempted Monopolization Claim Against MTS
 
 
 69
 Appellants claim that MTS attempted to monopolize the retail market in record and tape sales in the San Francisco Bay Area in violation of section 2 of the Sherman Act. An attempted monopoly claim under section 2 consists of three elements: (1) a specific intent to control prices or destroy competition in some part of commerce; (2) predatory or anticompetitive conduct directed to accomplishing the unlawful purpose; and (3) a dangerous probability of success. Twin City Sportservice, 676 F.2d at 1308; Portland Retail Druggists, 662 F.2d at 647. William Inglis, 668 F.2d at 1027.
 
 
 70
 In Inglis we discussed at length the interrelationship between the three elements. Thus we observed that intent to monopolize may be inferred from anticompetitive conduct but that to carry such a burden the conduct "must fall into one of two categories, either (1) conduct forming the basis for a substantial claim of restraint of trade, or (2) conduct that is clearly threatening to competition or clearly exclusionary." 668 F.2d at 1029 n. 11. In either case the conduct "must be such that its anticompetitive benefits [are] dependent upon its tendency to discipline or eliminate competition and thereby enhance the firm's long-term ability to reap the benefits of monopoly power." Inglis, 668 F.2d at 1030. In turn, the dangerous probability of success requirement, which is usually although not necessarily, associated with market power may be inferred from direct evidence of intent implemented by conduct, or conduct alone of the sort described above, from which intent may be inferred. 668 F.2d at 1029.
 
 
 71
 As the district court observed, appellants presented no direct evidence of specific intent to monopolize, relying instead on MTS' alleged anticompetitive conduct to prove a violation of section 2. Their chief claim in this regard is that Tower engaged in predatory pricing by setting its prices for records and tapes below appellants' cost of doing business.
 
 
 72
 A predatory price exists "where the firm foregoes short-term profits in order to develop a market position such that the firm can later raise prices and recoup profits." Janich Brothers, Inc. v. American Distilling Co., 570 F.2d 848, 856 (9th Cir.1977), cert. denied, 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978). In making such a determination we have had occasion to identify as a useful standard for predation the test set out by Professors Areeda and Turner. See P. Areeda & D. Turner, Predatory Pricing and Related Practices Under Section 2 of the Sherman Act, 88 Harv.L.Rev. 697 (1975); Inglis, 668 F.2d at 1033; Janich Bros., 570 F.2d at 858. Under this approach a price is not predatory if it equals or exceeds the average variable cost of production. P. Areeda & D. Turner, Predatory Pricing, supra, at 711.[20]
 
 
 73
 Pursuing such a guide, appellants' predatory pricing claim would appear to be inadequate on its face since it does not suggest that MTS priced below its own average variable cost--but that it was below only some unidentified cost of appellants. In Inglis we indicated that a plaintiff might be able to prove a predatory pricing claim without showing that the defendant priced below its average variable cost, see 668 F.2d at 1035, or even possibly below its average total cost.[21] However, in such instances it is the plaintiff's burden to prove that the defendant "sacrificed greater profits or incurred greater losses than necessary in order to eliminate the plaintiff." Inglis, 668 F.2d at 1036. In the absence of such a claim on the part of appellants, much less any evidence to that effect, appellants' predatory pricing claim is inadequate as a matter of law. Indeed, any other conclusion would support the perverse rationale that a defendant may not compete by lowering its prices "if competition would injure its competitors." California Computer Products, Inc. v. International Business Machines Corp., 613 F.2d 727, 742 (9th Cir.1979).
 
 
 74
 Appellants' other example of MTS' predatory conduct concerns MTS' negotiation of favorable sales terms with the individual distributors. Yet we have already concluded that such conduct did not constitute an unreasonable restraint of trade under section 1 of the Sherman Act. And since, as we have previously stated, the reasonableness standard of section 1 governs parallel conduct under section 2, see Inglis, 668 F.2d at 1030 n. 14; California Computer Products, 613 F.2d at 737, MTS' actions do not constitute a "substantial restraint of trade" in violation of section 2. Nor do we consider the attempt to negotiate favorable terms here "conduct that is clearly threatening to competition or clearly exclusionary."
 
 
 75
 Our conclusion regarding MTS' conduct in this case is reinforced by the evidence in the record concerning its market power. In Inglis we recognized that a defendant may introduce evidence "that market conditions are such that a course of conduct described by the plaintiff would be unlikely to succeed in monopolizing the market." 668 F.2d at 1030. See also Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc., 627 F.2d 919, 936 (9th Cir.1980), cert. denied, 450 U.S. 921, 101 S.Ct. 1369, 67 L.Ed.2d 348 (1981). Aside from their claim of "breath-taking growth of monopoly power," appellants suggested no evidence of market power whatsoever. In contrast MTS, introduced evidence that it operated only two retail stores in the six San Francisco Bay Area counties which the appellants asserted constituted a relevant geographic market and that it accounted for no more than 10% of the total retail record and tape sales in that area.[22] The absence of significant market power on the part of the MTS and the existence of numerous other retail outlets lends further weight to our conclusion that the appellants failed to raise an issue of material fact regarding the attempted monopolization claim.[23]
 
 C. Capitol's Refusal to Deal
 
 76
 Appellants contended that the district court erred in granting summary judgment in favor of Capitol on their refusal to deal claims under sections 1 and 2 of the Sherman Act. This court has previously held that a party may refuse to deal with another "provided there is no effect which contravenes the antitrust laws." Mutual Fund Investors, 553 F.2d at 626. In such cases, the adverse effects of the termination on the party refused are not relevant "when the refusal 'is for business reasons which are sufficient to the [defendant] in the absence of any agreement restraining trade.' " Chandler Supply Co. v. GAF Corp., 650 F.2d 983, 989 (9th Cir.1980) (quoting Bushie v. Stenocord Corp., 460 F.2d 116, 119 (9th Cir.1972)). Accord Marquis v. Chrysler Corp., 577 F.2d 624, 640 (9th Cir.1977). Such a determination is not appropriate for summary judgment where there is a material issue of fact regarding the defendant's unlawful intent or the anticompetitive effect of its action. California Steel & Tube v. Kaiser Steel Corp., 650 F.2d 1001, 1004 (9th Cir.1981); Program Engineering, 634 F.2d at 1196.
 
 
 77
 The district court concluded that Capitol's acknowledged aim of attempting to avoid future litigation after its settlement with appellants constituted a legitimate business purpose for the termination. During the period covered by the complaint, Capitol sold approximately $3,800 of records and tapes per year to Marin Music Centre. In June, 1975, Capitol and appellants entered into an agreement settling all of appellants' claims existing on that date for $7,500, but expressly permitting appellants to bring an action for events occurring after the date of the settlement. Capitol introduced evidence indicating that it stopped selling to Marin Music because of the near certainty that continuing business would give rise to litigation whose costs would exceed any benefits derived from that business.
 
 
 78
 Appellants point to two Ninth Circuit cases, Knutson v. Daily Review, Inc., 548 F.2d 795, 805 (9th Cir.1976), cert. denied, 433 U.S. 910, 97 S.Ct. 2977, 53 L.Ed.2d 1094 (1977), and Germon v. Times Mirror Co., 520 F.2d 786, 788 (9th Cir.1975), which suggest in dicta that a court may enjoin a defendant in an antitrust action from refusing to deal with the plaintiff. However, both of those cases involve the use of injunctions to preserve the status quo during the litigation, and more importantly, they recognize that the termination must be pursuant to a plan "to foster an unlawful competitive scheme." 520 F.2d at 788.
 
 
 79
 In contrast, in House of Materials, Inc. v. Simplicity Pattern Co., 298 F.2d 867 (2d Cir.1962), the court explicitly held that in the absence of any arrangement to restrain trade a manufacturer's refusal to deal with a retail store because of an antitrust suit filed against it by the store did not constitute an unlawful purpose in violation of the Sherman Act:
 
 
 80
 Appellee does not cite, and we have not found any case in which a "refusal to deal" based on a customer's prosecution of a suit against a manufacturer has been held to constitute an unreasonable restraint of trade. This when considered is not astonishing, for the relationship between a manufacturer and his customer should be reasonably harmonious; and the bringing of a lawsuit by the customer may provide a sound business reason for the manufacturer to terminate their relation.
 
 
 81
 298 F.2d at 871 (citations omitted). Thus Capitol's acknowledged purpose of avoiding future litigation whose costs exceeded the benefits from doing business with appellants qualified as a legitimate business reason for refusing to deal. See Marquis, 577 F.2d at 640.
 
 
 82
 As the district court recognized, appellants' only attempt to prove that the termination was otherwise violative of the antitrust laws was to suggest that it was connected with the alleged horizontal and vertical conspiracies among the distributors and chain store retailers. However, appellants introduced no evidence indicating any connection between the conspiracies alleged and the termination sufficient to raise an issue of material fact. See ALW, 510 F.2d at 55. Indeed Capitol's action did not even prevent appellants from selling its records. Capitol introduced evidence that its records were available from independent distributors and were in fact carried in appellants' store long after the termination. In any event, since we have concluded that appellants have failed to raise an issue of material fact regarding the existence of any such vertical or horizontal conspiracy, their allegations against Capitol based on those conspiracies were also appropriate for summary judgment.
 
 IV. CONCLUSION
 
 83
 The district court's judgment in favor of appellees on appellants' Robinson-Patman claims is reversed except as to Doug Robertson. The court's judgment as to the Sherman Act claims is affirmed. The case is remanded for further proceedings consistent with this opinion.
 
 
 
 *
 The Honorable David L. Bazelon, Senior Judge for the United States Court of Appeals for the District of Columbia Circuit, sitting by designation
 
 
 [1]
 Polygram Distribution, Inc. is the company's present name. The company was known as UDC, Inc. between 1971 and 1973, and Phonodisc, Inc. between 1974 and 1977
 
 
 [2]
 At the time of the filing of this action, MTS was the sole shareholder of Tower Enterprises, Inc., doing business as Tower Records. Since that time, Tower Enterprises, Inc. has merged into MTS
 
 
 [3]
 The district court limited the summary judgment to this period because the declaration of Dale Johnson, a Polygram employee, filed in support of the motion, did not demonstrate personal knowledge for the 1971-73 period. The court denied Polygram's motion for the period 1971-73 without prejudice to its renewal
 
 
 [4]
 The court's order effectively removed Capitol as a defendant. However, since Capitol neither requested nor received a separate judgment under Rule 54(b) of the Federal Rules of Civil Procedure, it did not take an appeal until after the court entered final judgment in June, 1980
 
 
 [5]
 In summary, the appellees in this action include five distributors: WEA, Polygram, Capitol, ABC, and MCA; one retailer, MTS; and Doug Robertson Advertising Agency. Appellants appeal the following rulings with respect to each defendant:
 WEA: June 21, 1976, CR 311, partial summary judgment on the Robinson-Patman claims.
 January 17, 1980, CR 808, summary judgment on the Sherman Act claims.
 POLYGRAM: August 17, 1977, CR 499, partial summary judgment on the Robinson-Patman claims for 1974-76.
 January 17, 1980, CR 808, summary judgment on the Robinson-Patman claims for 1971-73 and on Sherman Act claims.
 MCA: January 17, 1980, CR 808, summary judgment on both the Robinson-Patman and Sherman Act claims.
 CAPITOL: September 28, 1978, CR 636, summary judgment on the refusal to deal Sherman Act claim.
 ABC: May 12, 1980, CR 851, summary judgment on both the Robinson-Patman and Sherman Act claims.
 MTS-TOWER & DOUG ROBERTSON: January 17, 1980, CR 808, summary judgment on both the Robinson-Patman and Sherman Act claims.
 
 
 [6]
 WEA is a wholly owned subsidiary of Warner Brothers Records, Inc., which in turn is owned by Warner Communications, Inc. WEA distributes records and tapes manufactured by Warner Brothers Records and two other Warner Communications, Inc. subsidiaries, Elektra Records and Atlantic Records. Polygram is a California corporation distributing records and tapes produced by affiliated corporations, Polygram, Inc. and Polydor International
 
 
 [7]
 MCA is a wholly owned subsidiary of MCA Records, Inc. From 1971 to 1979 ABC was a wholly owned subsidiary of American Broadcasting Companies, Inc. In 1979, it went out of business and its assets were sold to MCA
 
 
 [8]
 Although MCA's declaration in support of its motion for summary judgment does not contain any percentage figures on the amount of records and tapes manufactured outside of California, it seems to indicate that a substantial amount of the records in its California warehouse were manufactured in Illinois. ABC's answers to interrogatories indicate that an unidentified percentage of the records and tapes in its California warehouse were manufactured outside of California
 
 
 [9]
 The relevant jurisdictional language in section 2(a) reads:
 It shall be unlawful for any person engaged in commerce, in the course of such commerce to discriminate in price between different purchasers ... where either or any of the purchases involved in such discrimination are in commerce.
 
 
 [10]
 Appellees argue that Gulf Oil superseded the "flow of commerce" test and therefore requires an actual sale across state lines to invoke the Act. However, in Gulf Oil, the product sold, asphaltic concrete, was manufactured entirely in state from products obtained intrastate and its market was entirely local. 419 U.S. at 192, 95 S.Ct. at 397. Therefore, the Court did not have to address the issue when sales of goods produced in another state are "in commerce."
 In fact, however, the court in Gulf Oil repeatedly refers to the flow of commerce test. Thus in comparing the Sherman Act and Robinson-Patman Act jurisdictional provisions the Court states:
 In contrast to Sec. 1, the distinct "in commerce" language of the Clayton and Robinson-Patman Act provisions with which we are concerned here appears to denote only persons or activities within the flow of interstate commerce--the practical, economic continuity in the generation of goods and services for interstate markets and their transport and distribution to the customer.
 419 U.S. at 195, 95 S.Ct. at 398.
 Accordingly, courts interpreting section 2(a) after Gulf Oil continued to apply the "flow of commerce" analysis. See L & L Oil Co. v. Murphy Oil Corp., 674 F.2d 1113, 1116, (5th Cir.1982); Great Atlantic & Pacific Tea Co. v. FTC, 557 F.2d 971, 979 (2d Cir.1977), revd. on other grounds, 440 U.S. 69, 99 S.Ct. 925, 59 L.Ed.2d 153 (1979); Hampton v. Graff, 516 F.2d 100 (5th Cir.1975).
 
 
 [11]
 The other indicium of intent involves whether goods have been altered or processed in some fashion after their arrival in the state of their eventual sale. Courts have generally held that where goods are processed in some substantial way, the flow of commerce ends when they arrive at the place of alteration. See Belliston v. Texaco, Inc., 455 F.2d 175 (10th Cir.), cert. denied, 408 U.S. 928, 92 S.Ct. 2494, 33 L.Ed.2d 341 (1972); Baldwin Hills Building Material Co. v. Fibreboard Paper Products Corp., 283 F.Supp. 202 (C.D.Cal.1968); Von Kalinowski, supra, at Sec. 26.02
 In this case, since the records and tapes were sealed after manufacture, this factor is not relevant.
 
 
 [12]
 In American Building Maintenance, the Supreme Court held that two janitorial service corporations were not "in commerce" as required under section 7 of the Clayton Act. In particular the court rejected the United States' claim the firms' purchases of cleaning equipment manufactured out of state provided jurisdiction:
 [T]hose products were purchased in intrastate transactions from local distributors. Once again, therefore, the Benton companies were separated from direct participation in interstate commerce by the pricing and other marketing decisions of independent intermediaries. By the time the Benton companies purchased their janitorial supplies, the flow of commerce had ceased.
 422 U.S. at 285, 95 S.Ct. at 2159. In contrast, here there is a legitimate question of material fact whether the record retailers were in fact insulated from interstate commerce by WEA or Polygram.
 
 
 [13]
 Appellants interpret Inglis to suggest that any interstate sales by the record distributors here satisfy the Robinson-Patman jurisdictional requirements. However, their reliance on Inglis fails to recognize the structural difference between the two cases. Inglis was a "primary line" Robinson-Patman case in which the plaintiff alleged that another seller's discriminatory pricing scheme damaged his bakery. As the court in Inglis noted, in such a primary line case the relevant sales for jurisdictional purposes include all sales, both intrastate and interstate, reflecting the price disparity since the court is concerned with all sales which allegedly damaged a competitor's business
 In contrast, this is a "secondary line" case, in which one buyer complains of discriminatory treatment between itself and another buyer. In such a case, the only relevant sales are those between the competing buyers. Mayer Paving & Asphalt Co. v. General Dynamics Corp., 486 F.2d 763, 767 (7th Cir.1973), cert. denied, 414 U.S. 1146, 94 S.Ct. 899, 39 L.Ed.2d 102 (1974); P. Areeda & D. Turner, supra, at p 233(c). Out of state sales made by the distributors are irrelevant in this case since they were not made to stores competing with appellants.
 
 
 [14]
 Sections 2(d) and 2(e) of the Robinson-Patman Act, 15 U.S.C. Secs. 13(d) and 13(e) provide:
 (d) Discriminatory payments for services or facilities
 That it shall be unlawful for any person engaged in commerce to pay or contract for the payment of anything of value to or for the benefit of a customer of such person in the course of such commerce as compensation or in consideration for any services or facilities furnished by or through such customer in connection with the processing, handling, sale or offering for sale of any products or commodities manufactured, sold, or offered for sale by such person, unless such payment or consideration is available on proportionally equal terms to all other customers competing in the distribution of such products or commodities.
 (e) Discrimination in furnishing services or facilities
 That it shall be unlawful for any person to discriminate in favor of one purchaser against another purchaser or purchasers of a commodity bought for resale, with or without processing, by contracting to furnish or furnishing, or by contributing to the furnishing of, any services or facilities connected with the processing, handling, sale or offering for sale of such commodity so purchased upon terms not accorded to all purchasers on proportionally equal terms.
 
 
 [15]
 The district court also dismissed appellants' claim against MTS under sections 2(d) and 2(e) for receiving discriminatory payments or services. Unlike section 2(f), sections 2(d) and 2(e) do not provide for a buyer's liability for receiving enumerated benefits. See Rowe, supra, at Sec. 14.5. Consequently there is no private right of action against buyers for violating those sections. See Grand Union Company v. FTC, 300 F.2d 92 (2d Cir.1962); Rickles, Inc. v. Frances Denney Corp., 508 F.Supp. 4 (D.Mass.1981); General Beverage Sales Co. v. East Side Winery, 396 F.Supp. 590 (E.D.Wis.1975). Cf. American News Co. v. FTC, 300 F.2d 104 (2d Cir.), cert. denied, 371 U.S. 824, 83 S.Ct. 44, 9 L.Ed.2d 64 (1962) (FTC may reach such conduct as an "unfair trade practice" under section 5 of the Clayton Act, 15 U.S.C. Sec. 15)
 
 
 [16]
 The district court observed the same evidentiary shortcomings on appellants' part in its opinion granting summary judgment in favor of Capitol on the refusal to deal claim in September, 1978, see 1978-2 Trade Cases p 62,269 (N.D.Cal.1978), and its subsequent opinion granting summary judgment on the Sherman Act claims in favor of appellees WEA, MCA, Polygram, MTS and Doug Robertson of June, 1980. 533 F.Supp. 540 (N.D.Cal.1980)
 
 
 [17]
 Appellants also allege a variant of the overall conspiracy consisting of a series of conspiracies between all the distributors and each chain store retailer. Summary judgment was appropriate as to this claim for the same reasons as in our discussion of the overall conspiracy set out below
 
 
 [18]
 In what appears as an afterthought, appellants also claim that the distributors engaged in resale price maintenance. Yet they offered no probative evidence in support of this proposition. Moreover, the claim is fundamentally inconsistent with their principal theory of the case--that the Zoslaws were unable to compete with the large retailers because the distributors gave those retailers more favorable terms. Under appellants' theory, retail price maintenance would have been advantageous to them since it would have restricted the large retailers' ability to undercut their prices
 
 
 [19]
 In contrast, we have recognized that a predatory pricing claim may form the basis of both a primary-line Robinson-Patman case alleging injury to another seller and a section 2 Sherman Act claim since both statutory provisions "are directed at the same evil and have the same substantive content." William Inglis, 668 F.2d at 1041 (quoting Janich Brothers, Inc. v. American Distilling Co., 570 F.2d 848, 855 (9th Cir.1977)). Here, however, appellants' secondary-line Robinson-Patman claim--that they did not receive the same price as a competing buyer--has no direct counterpart under section 1 of the Sherman Act
 
 
 [20]
 According to Areeda and Turner average variable cost is actually an imperfect substitute for marginal cost, made necessary because business firms rarely keep records reflecting marginal cost. P. Areeda & D. Turner, Predatory Pricing, supra, at 717. A price equal or exceeding marginal cost is the appropriate test because then only less efficient producers will suffer larger losses per unit. In addition a price equal to marginal cost signals to consumers the "true social cost" of producing the additional unit, therefore promoting the efficient allocation of resources. P. Areeda & D. Turner, Predatory Pricing supra, at 710-713; Inglis, 668 F.2d at 1032
 
 
 [21]
 Inglis specifically reserved the question whether a price above the defendant's average total cost could ever be considered predatory. 668 F.2d at 1035 n. 30. In that instance the producer recovers the total cost of production, including fixed costs, as well as a "normal" rate of return on its investment, making the price "profitable" from an economist's view. Id
 
 
 [22]
 MTS did not operate any stores in Marin County during the period in question. Its two stores in the San Francisco Bay Area are in San Francisco and Berkeley
 The district court identified the relevant geographic market here as the San Francisco-Marin County market since that is the only geographic area of competition between Marin Music Centre and MTS. Yet appellants did not present any evidence nor do they even argue that MTS' share of this submarket is larger than its share of the six San Francisco Bay Area counties. Indeed, MTS only operates one store in the "San Francisco-Marin County" market.
 
 
 [23]
 Appellants' complaint also charged MTS with monopolization of the retail record and tape market in violation of section 2 of the Sherman Act. The district court granted summary judgment on this claim and appellants do not raise this issue on appeal. In any event, appellants' failure to respond to MTS' evidence of its relatively small market share made summary judgment on this claim appropriate. See, e.g., Forro Precision, Inc. v. International Business Machines Corp., 673 F.2d 1045, 1058 (9th Cir.1982) (evidence of 35% of market share alone insufficient as a matter of law to support monopolization claim)